# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HOMF II INVESTMENT CORP., OBD PARTNERS, LLC, and BRETT JEFFERSON, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0293-JTL |
| | ) | |
| JOAQUIN ALTENBERG, and VERT SOLAR FINANCE, LLC, | ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| VERT SOLAR FUND I, LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 19, 2020
Date Decided: May 19, 2020

Sidney S. Liebesman, Johnna M. Darby, E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, Delaware; *Attorneys for Plaintiffs*.

David E. Wilks, Andrea S. Brooks, Adam J. Waskie, WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; *Attorneys for Defendants Joaquin Altenberg and VERT Solar Finance, LLC*.

**LASTER, V.C.**

Defendant Joaquin Altenberg convinced the plaintiffs to invest in VERT Solar Fund I, LLC (the "Fund"), a newly created investment fund. The plaintiffs were its only investors. Altenberg managed the Fund through now-bankrupt defendant VERT Solar Finance, LLC ("Finance"), an entity that he controlled.

The plan was for the Fund to acquire solar projects, own them through special purpose vehicles, and provide the equity capital necessary to bring them to commercial operation. Altenberg represented that once a project achieved commercial operation, it could be refinanced with long-term debt, which would enable the Fund to recover its equity investment, plus a return. In addition, the Fund would own the project and thus would have a right to ongoing cash flows. Altenberg represented that he could take a project from acquisition to refinancing in as little as three to six months, enabling him to revolve the Fund's equity through multiple projects and generate munificent gains.

The Fund performed disastrously. The plaintiffs contributed a total of $6,829,500 in capital to the Fund. Nothing remains. Finance, however, received $2.37 million in fees, reflecting 35% of the plaintiffs' investment.

The plaintiffs filed this lawsuit against Altenberg and Finance and pursued it through trial. During post-trial briefing, the plaintiffs emphasized four claims. First, they contended that Altenberg fraudulently induced them to invest in the Fund. Second, they contended that Altenberg committed fraud during the life of the Fund. Third, they contended that Altenberg breached his fiduciary duties. Fourth, they contended that Finance breached its contractual obligations to the Fund and that Finance's entity veil should be pierced so that Altenberg would be held personally liable for the damages.

The evidence at trial demonstrated that Altenberg induced the plaintiffs to invest in the Fund by making false representations, that the plaintiffs relied on those false representations, and that they suffered damages as a result. Ordinarily, these findings would result in the plaintiffs receiving a remedy. In this case, however, the plaintiffs did not introduce a fraudulent inducement theory in a procedurally proper way. They did not put Altenberg on notice of that theory before trial, and they did not seek to conform the pleadings to the evidence after trial. Judgment thus will be entered in favor of Altenberg on this claim.

The plaintiffs failed to prove that Altenberg committed fraud during the life of the Fund. Judgment will be entered in favor of Altenberg on this claim.

The plaintiffs proved that Altenberg breached his fiduciary duty of loyalty while managing the Fund. The plaintiffs proved that Altenberg engaged in self-interested transactions, and Altenberg failed to prove that his actions were entirely fair.

This decision does not determine a remedy for Altenberg's breaches of the duty of loyalty. The parties focused primarily on liability in their post-trial submissions. Although the record currently contains sufficient information to quantify roughly the damages from certain breaches, further proceedings are warranted to clarify the record and assist the court in tailoring an appropriate remedy.

This decision does not address the breach of contract theory. In June 2019, with trial looming, Altenberg caused Finance to declare bankruptcy. All claims against Finance were stayed. This court therefore cannot adjudicate the claim against Finance that is the predicate to potentially holding Altenberg personally liable.

2

# I. FACTUAL BACKGROUND

Trial took place over three days. The parties introduced 1,502 exhibits and lodged eleven deposition transcripts. Five fact witnesses testified live. The parties agreed to 163 stipulations of fact in the pre-trial order.[1]

The standard of proof for all of the claims in this case was a preponderance of the evidence. *See Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009), *aff'd*, 991 A.2d 1153 (Del. 2010); *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010). The burden of proof differed depending on the claim being asserted. For the claim of breach of fiduciary duty, the plaintiffs bore the burden of proving that Altenberg had engaged in self-interested conduct. Once the plaintiffs carried that burden, Altenberg had the burden of proving that his conduct was entirely fair. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012). For the other claims, the plaintiffs bore the burden of proof.

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 261. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number or, if the document lacked a control or JX number, then by the internal page number. If a trial exhibit used paragraph numbers or sections, then references are by paragraph or section.

## A.      Jefferson Becomes Interested In Solar Projects

Plaintiff Brett Jefferson is a professional investor who controls Hildene Capital Management, an investment management firm. Hildene has $9.6 billion in assets under management.

In 2014, Jefferson became interested in solar projects after moving to the Virgin Islands. Sensing that financing solar projects might provide an investment opportunity, he spoke with a few colleagues, who put him in touch with Altenberg.

Jefferson and Altenberg had crossed paths in 1996 when they worked at Smith Barney LLC. They subsequently went their separate ways, with Altenberg holding a series of jobs in the finance industry. *See* JX 1198 at 28–34; Altenberg Tr. 305–09. In 2008, Altenberg entered the renewable energy field by creating VERT Investment Group, LLC, an entity that he personally owns and controls. PTO ¶ 10; Altenberg Tr. 309–10. Altenberg eventually became associated with Open Energy Group, Inc. ("Open Energy"), a small broker-dealer that arranged and securitized debt financing for renewable energy projects. PTO ¶ 20; Jefferson Tr. 146.

By 2013, Altenberg had become interested in developing and financing solar projects. *See* JX 98. In January 2015, he formed Finance to focus on middle-market solar projects. PTO ¶ 33; Altenberg Tr. 328. Shortly after Altenberg formed Finance, Jefferson spoke with him about financing solar projects in the Virgin Islands. JX 102; JX 105; Jefferson Tr. 14, 16–17.

Altenberg is a smooth talker, and Jefferson was impressed with him. In February 2015, Jefferson asked Altenberg if he would like to work on his Virgin Islands projects "in

4

a more formal way." JX 107. Altenberg responded that he was "happy to support this effort." *Id.* Altenberg testified at trial that Jefferson asked whether he could invest in Finance. Altenberg Tr. 338−39. That testimony was not credible. Jefferson was looking for backing from Open Energy to pursue his own projects in the Virgin Islands, and he wanted Altenberg to come work for him. He was not looking to invest with Altenberg. *See* JX 110; JX 111; JX 112; Jefferson Tr. 157−59.

## B.     Altenberg Solicits An Investment From Jefferson.

In May 2015, Altenberg pitched Jefferson on investing $15 million in Finance. Jefferson Tr. 161. On May 14, Altenberg emailed Jefferson a set of materials for the purpose of seeking an investment from Jefferson. Altenberg Tr. 510; *see* JX 3; JX 121.

Jefferson told Altenberg that if he decided to move forward with the investment, then he might want to bring other investors with him. That was fine with Altenberg, so Jefferson shared Altenberg's solicitation materials with other investors that he knew. *See, e.g.*, JX 122; JX 123; JX 124; JX 125. Jefferson successfully recruited James Murphy, a close friend who managed plaintiff OBD Partners, LLC, a small investment fund with around $3 or $4 million under management.[2] On May 28, 2015, Altenberg provided Jefferson with a slightly updated set of materials for Jefferson and Murphy to review. JX 126.

---

[2] JX 123; JX 127; Murphy Tr. 743, 744–45, 749. This decision refers to Murphy and OBD Partners interchangeably because Murphy invested in the Fund through OBD Partners, and no one else from OBD Partners was involved with the investment.

Altenberg's solicitation materials described three tiers of solar projects. The bottom tier involved small projects, typically residential installations. The top tier involved large projects, typically for utilities. In between was the middle market, which involved projects for commercial and smaller-scale industrial users. A middle-market project could range from 500 kilowatts, such as a roof-mounted system for a small grocery store, to 20 megawatts, such as a field of solar panels on 80 to 100 acres. *See* JX 3 at '071; JX 126 at '111; Altenberg Tr. 313.

Altenberg's solicitation materials explained that it was challenging to invest in the bottom and top tiers because a handful of players already dominated them. *See* JX 3 at '071; JX 126 at '111. Altenberg represented that the middle market was highly fragmented, making it an ideal investment opportunity. *See* JX 3 at '071–73; JX 126 at '111–13.

Altenberg's solicitation materials summarized a three-stage process for completing a solar project: (1) design and development, (2) construction and financing, and (3) commercial operations and re-financing. JX 3 at '076, '088; JX 126 at '116, '128. During the first phase, the developer performs the preliminary work necessary to begin construction, including:

- obtaining a lease for the site from the site owner,

- entering into a power purchase agreement with the site owner under which the site owner agrees to purchase power from the developer once the project is operational;

- conducting site assessments to plan the project,

- obtaining permits,

- entering into an interconnection agreement with the transmission system operator so that the project can add its power to the electric grid, and

6

- conducting an environmental study.

*See* JX 3 at '095; JX 126 at '135; Altenberg Tr. 312–16.

Once a developer has completed the preliminary work and received its permits, then the county or municipality where the project is located issues a "notice to proceed" with construction, referred to as "NTP." JX 1499; Altenberg Tr. 312. At that point, the project enters the second phase: construction and financing. JX 1499; Altenberg Tr. 316.

The financing of a solar project is highly complex because of the availability of federal tax credits. The Internal Revenue Code authorizes the owner of a project to claim an energy investment tax credit in the year after the project becomes operational. *See* 26 U.S.C. § 48. For any project that started construction before 2022, the credit is equal to 30% of the amount invested in the project. *Id.* § 48(a)(2)(A)(i)(II), (III).

Altenberg's solicitation materials explained that because of the availability of tax credits, the financing of a solar project typically has three components: a tax-equity investment, traditional debt financing, and traditional equity financing. *See* JX 3 at '075; JX 126 at '115; JX 1499. To grossly oversimplify a highly complex structure, the tax-equity investor purchases an equity stake in the project at a discount to the expected value of the tax credit. The developer uses the tax-equity investor's up-front payment as part of the construction financing package. After the project is completed, the tax-equity investor claims the full value of the tax credit.

Altenberg's solicitation materials represented that Finance was "a leading tax equity expert" with "extensive relationships with tax equity investors." JX 3 at '078; JX 126 at '118. On a slide titled "Established Relationships Across the Industry," Altenberg

7

represented that Finance had "pre-existing relationships with leading industry players," and identified the following companies as "Tax Equity Providers": Google, JP Morgan, US Bank, MetLife, and Bank of America. JX 3 at '077; JX 126 at '117. In this litigation, Altenberg stipulated that Finance has never received tax equity financing from Google, JP Morgan, US Bank, MetLife, or Bank of America. PTO ¶¶ 133–37. His materials also represented that Finance "will have a dedicated tax equity fund to support the capitalization of each projects [*sic*] on a fixed term and structured basis." JX 3 at '078; JX 126 at '118. It never did.

The second component of project financing is debt financing, initially as part of the construction financing package and subsequently as multi-year term loan once project achieves commercial operation. *See* JX 1499. Altenberg's solicitation materials represented that Finance had a dedicated sources of debt financing. On a slide titled "VERT Solution," under a heading titled "Dedicated Sources of Capital," the solicitation materials listed "Debt Financing (Open Energy Group)" with a checkmark beside it, indicating that this component already had been secured. JX 3 at '075; JX 126 at '115. Three pages later, on a slide titled "Dedicated Capital," under a heading titled "Debt," Altenberg again identified Open Energy. JX 3 at '078; JX 126 at '118. The same slide noted that Altenberg, the "founder" of Finance, was "also a co-founder of" Open Energy. JX 3 at '078; JX 126 at '118. On the slide titled "Established Relationships Across the Industry" Finance identified its "pre-existing relationships with leading industry players." JX 3 at '077; JX 126 at '117. That slide identified the following companies as "Lenders": Open Energy, CoBank, Morgan Stanley, US Bank, and Bank of America. In this litigation, Altenberg

8

stipulated that Finance has never entered into a loan agreement with Open Energy, CoBank, Morgan Stanley, Bank of America, US Bank, or any of their affiliates or subsidiaries. PTO ¶¶ 126–27, 129–31. Altenberg had only the loosest of ties to two of the identified lenders. Through VERT Investment Group, Altenberg entered into a loan agreement with CoBank for a wind project in 2010. PTO ¶ 128. And VERT Investment Group once had obtained a loan from US Bank. PTO ¶ 132.

Altenberg told Jefferson and Murphy that because of his relationships, the debt-financing component was "a lock." Jefferson Tr. 20; Murphy Tr. 759–60. Jefferson believed that debt financing was the most difficult component of the financing package to obtain. Jefferson Tr. 11–12, 26, 27. Jefferson decided to move forward with the deal, in part, because Altenberg "had [Open Energy], and [Open Energy] was going to get the [debt] financing because he was the cofounder of [Open Energy], and that's what they did." Jefferson Tr. 277. Murphy likewise viewed the Open Energy connection as "incredibly important" to his decision to invest. Murphy Tr. 748.

The third component of the financing package—equity financing—was what Altenberg represented that he needed to make the business work. Jefferson Tr. 26–27. Altenberg's solicitation materials stated that he was looking for an equity investor to provide the traditional equity portion of the financing package. JX 3 at '078; JX 126 at '118; *see* JX 98; Jefferson Tr. 26; Altenberg Tr. 521. On the slide titled "VERT Solution," under a heading titled "Dedicated Sources of Capital," Altenberg listed check marks beside both "Debt Financing (Open Energy Group)" and "Tax Equity (Fund)." JX 3 at '075; JX

9

126 at '115. He put a red "X" beside "Equity," indicating that equity was all he needed. JX 3 at '075; JX 126 at '115; Jefferson Tr. 26; Murphy Tr. 746.

The solicitation materials depicted the equity component as a short-term, high-return investment. Altenberg represented that to obtain construction financing, a project required an equity investment equal to 20% of the total cost of construction. Jefferson Tr. 20; *see* Altenberg Tr. 319. He represented that once a project reached its commercial operation date ("COD"), it would be possible to refinance the project with long-term debt supported by the revenue from the power purchase agreement. With the tax equity staying in the deal, the long-term financing would be sufficient to pay off the construction financing and allow the equity investor to receive back its capital and a potential return on equity. The equity then could be reinvested in the next project. As Altenberg explained it in his solicitation materials, "We will reinvest the equity from each project into the next project thereby revolving the equity as we complete construction and refinancing at commercial operations (COD)." JX 3 at '078; JX 126 at '118; *see* JX 1499. What made the investment particularly attractive was that even after the equity investors received a return of their equity capital, the Fund would own the project, meaning that the Fund would be entitled to receive the free cash flow from the project over its multi-year life. Jefferson Tr. 20, 172–73; *see* Altenberg Tr. 319–20.

Altenberg represented that he would complete a project and reinvest the Fund's equity in three to six months. According to his solicitation materials, the "Timing per Project" would be "3 to 6 months from project selection to commercial operations." JX 3 at '079; JX 126 at '119; *see* Jefferson Tr. 23–24; Murphy Tr. 753. The equity component

thus could be recycled at least twice per year to generate high returns. Jefferson Tr. 30–31; *see* JX 3 at '078; JX 126 at '118. Altenberg's solicitation materials provided four case studies depicting projects that had been refinanced at COD to generate proceeds that equaled or exceeded the original commitment of debt and equity capital during the construction phase. *See* JX 3 at '091–94; JX 126 at '131–34.

Altenberg proposed that Jefferson and Murphy invest $15 million in Finance in return for Series A Preferred Shares that could be called at par after two years and would be convertible into 40% of Finance's equity. Jefferson Tr. 25; *see* JX 3 at '079; JX 126 at '119. He represented that their investment would be "backed by hard assets," *i.e.*, the solar projects themselves. JX 3 at '079; JX 126 at '120. He projected that annual operating expenses would equal 2% of the cash available for investment. JX 3 at '079. He proposed that the preferred stock earn a dividend of 8% annually. In the May 14 version of his solicitation materials, Altenberg provided financial projections that forecast a return of 8.0x invested capital in five years, reflecting an internal rate of return of 60%. JX 3 at '080. In the May 28 version of his solicitation materials, he reduced the figures to 7.9x invested capital and an internal rate of return of 51%. JX 126 at '120. In the May 28 version, Altenberg removed the line item projecting that annual operating expenses would equal 2% of the cash available for investment. *See id.* at '119.

## C.    The Fund

After considering Altenberg's proposal, Jefferson and Murphy declined to invest directly in Finance because they did not want to give their capital to Altenberg to use to fund Finance's business as he pleased. *See* Jefferson Tr. 19, 31–32. To give the investors

11

more control over their investment, Altenberg proposed that Jefferson and Murphy invest directly in the solar projects through a dedicated fund. *See* Jefferson Tr. 34; Murphy Tr. 754–55.

On June 1, 2015, Altenberg sent Jefferson and Murphy a flow-of-funds diagram that depicted how an investment in the Fund would work. JX 136; *see* JX 1495. The investors would commit capital to the Fund, which would be managed by Finance. JX 1495; Murphy Tr. 766. Once Finance identified a project, it would create a special purpose entity for the project that would be a subsidiary of the Fund. Finance then would make a capital call for the development expenses, and the Fund would contribute the capital to the project company. Other parties, such as a co-developer, might receive an equity stake in the project company. The project company would develop the project. At NTP, Finance would make a second capital call for the additional equity necessary to obtain construction financing, and the Fund would contribute the capital to the project company. Once construction was complete and the project reached COD, then the project company would refinance the project with a long-term financing package, pay a development fee to Finance, and return the equity in the project company up to the Fund. *See* JX 1495.

The flow-of-funds diagram did not show any funds flowing to Finance from the Fund, only from the project companies. JX 1495; Jefferson Tr. 35; Murphy Tr. 766–67. Jefferson and Murphy understood this to mean that Finance would receive any fee at COD, when the project was refinanced. Murphy Tr. 767. The flow-of-funds diagram indicated that after COD, when the equity was returned to the Fund, the profits would be divided 50/50 between the investors and Finance. JX 1495. Under this arrangement, the primary

12

source of compensation for Finance would be its rich carried interest in each project company, reflecting a full 50% of the profits. Jefferson Tr. 47.

Jefferson told Altenberg that the flow-of-funds diagram "makes sense." JX 137. After they had a call to discuss it, they asked their lawyers to prepare an operating agreement for the Fund. *See* JX 139.

Other evidence in the record corroborates Jefferson and Murphy's understanding of how Altenberg said that the Fund would work. During the same period when he was soliciting an investment from Jefferson and Murphy, Altenberg solicited an investment from Tamra-Tacoma Capital Partners. JX 133. Altenberg misrepresented Jefferson's commitment, describing the "Jefferson Investor" as having committed "$3M – $50M" to the Fund. *Id.* at '122. The rest of his description of the deal with Jefferson matched his representations to Jefferson and Murphy. He depicted a "Representative Transaction" that would cost $10 million from acquisition though commercial operation. *Id.* at '123. He showed a total of $2 million coming from the Fund, with half ($1 million) for project development to bring the project to NTP, and the other half ($1 million) for the equity component of the construction financing package. *Id.* At COD, he showed the $2 million being returned to the Fund and estimated that there would be "[e]xcess proceeds from refinancing of $1.3M" that would be used to cover Finance's fees of $700,000 and provide a return to the Fund. *Id.* at '124. This idea was not new for Altenberg. He previously had outlined a similar concept in a document dated March 14, 2013, which described the flow of funds for "VERT Solar Finance Company" in a manner that closely resembled the deal that Altenberg pitched to Jefferson and Murphy. JX 98 at '264.

13

**D. Project Cali**

In addition to rejecting the idea of investing directly in Finance, Jefferson told Altenberg that he and Murphy would not invest $15 million all at once. Jefferson Tr. 31. They wanted Altenberg to demonstrate that his concept would work by completing an initial project. *Id.*; Murphy Tr. 751. Altenberg responded by identifying "Project Cali" as the Fund's initial project. *See* Jefferson Tr. 36, 38, 39–40; Murphy Tr. 756–58. Altenberg represented that Project Cali was lined up and required a prompt investment. Jefferson Tr. 40, 44; Murphy Tr. 756–57; *see* Altenberg Tr. 527.

At the end of May 2015, after he had sent the updated solicitation deck to Jefferson and Murphy, Altenberg provided them with a financial model for Project Cali. *See* JX 4; JX 131; Jefferson Tr. 39. It depicted a project in California City, California, that was being developed by American Solar Utility LLC. JX 4 at 4. The project size was about 2.25 megawatts, and it would generate an investment tax credit of $6,069,060. *Id.* The presentation showed how the investors' money would be used, what the debt financing would look like, and the projected payback. Jefferson Tr. 40–41.

The model also illustrated how the long-term financing would replace the initial financing package at COD. At that point, the presentation depicted $382,126 in fees paid to Finance, $1 million in capital being returned to the Fund, and a return of $325,098 for Finance and the Fund's investors. JX 4 at 5. Finance notably would receive its fee at COD, not before COD. *Id.*; *see* Murphy Tr. 762–73.

Jefferson and Murphy understood that the presentation materials for Project Cali depicted a specific and actionable project. Jefferson Tr. 36; Murphy Tr. 756–58. The

14

presentation materials reinforced this impression. The second page of the presentation stated: "This Financial Model (the 'Model') has been provided to you in relation to Project Cali . . . and relates to the offering of equity stakes in a solar PV generating plant located in California (the 'Project')." JX 4 at 2. Although the page contained customary disclaimers regarding reliance on the projections and other forward-looking statements, there was nothing to suggest that Project Cali was not an available project. By all appearance and accounts, it was a project that Finance had authority to offer to potential investors.[3]

In addition to the financial model, Altenberg provided Jefferson and Murphy with a term sheet from Open Energy for Project Cali. JX 1501. Although not a binding commitment, the term sheet appeared actionable. *See* JX 1501. The only information that was redacted from the term sheet was the name and address of the potential borrower. JX 1501 at '619, '624, '626.

Jefferson understood that Project Cali was the first project in which he would invest. Jefferson Tr. 40. He based his decision to invest with Altenberg on the presentation about Project Cali. Jefferson Tr. 36, 39, 42; *see* JX 1502 (Murphy following up on "the California City investment" as "the first and principal investment we funded").

---

[3] *See, e.g.*, *id.* ("The Model is being delivered . . . to a limited number of parties who may be interested in a potential purchase of the Project."); *id.* ("The sole purpose of the Model is to assist the recipient in deciding whether to proceed with a further investigation of the Project."); *id.* ("[Finance] acting through themselves and their affiliates have been authorized to act as the exclusive agent in the direct sale of the Project described in this Model.").

At trial, Altenberg testified that that the presentation on Project Cali was simply an illustration. He claimed it was only a model based on "numbers that [were] indicative" of a "project in California City" that Altenberg was "trying to get." Altenberg Tr. 527. Altenberg testified that he thought it was a helpful example to explain to Jefferson and Murphy how a project might work. That testimony was not credible. The evidence supports Jefferson's testimony that Altenberg presented Project Cali as the Fund's first project. *See* Jefferson Tr. 164.

## E.    The Operating Agreement

Because of the plan to invest in Project Cali, the parties rushed through the process of negotiating and drafting an operating agreement, which took only eleven days. During the negotiations, the parties agreed on the following points:

- "EACH PROJECT UNDER THIS FUND WILL BE IN A SEPARATE SPE . . . ." JX 143 at '395.

- "[T]he fees to [Finance] will be capped at $170K per MW." *Id.* at '394.

- "[A]fter each project the proceeds are returned to the Fund . . . ." *Id.*

Importantly, the parties agreed that "no additional capital will be called from the Investment Members [until after] long-term financing is secured for the initial California project." JX 143 at '392; *see id.* at '391. This was a reference to Project Cali. Jefferson Tr. 36. Jefferson made clear that he viewed the Fund as "a 'one project at a time' set-up with a rollover option following the completion of each project." JX 143 at '392. Contrary to the parties' explicit agreement, Altenberg testified that he believed at all times that the Fund would invest in portfolios of projects. Altenberg Tr. 353–54, 356. He claimed,

16

contrary to the evidence, that it "was never contemplated" "to do a one-off project." *Id.* at

356. That testimony was not credible.

The original operating agreement for the Fund was signed on June 11, 2015. PTO

¶ 22; JX 175.[4] It memorialized the parties' understanding of the business relationship in

the purpose clause for the Fund:

> Subject to the limitations set forth in this Agreement, the purpose of the [Fund] shall be to identify, finance, acquire, develop, manage and dispose of Projects, to arrange and provide financing and other services relating thereto, and to engage in any other lawful act or activity for which limited liability companies may be organized under the Act. The [Fund] has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the foregoing purposes and has, without limitation, any and all powers that may be exercised by a limited liability company under the Act.
>
> *The Members intend that the [Fund] own one (1) or more ProjectCos, as separate limited liability companies, each to exist solely for the ownership, development, construction, operation, and potential sale or transfer of a Project.*
>
> *Each ProjectCo shall be owned and managed solely by the [Fund] (and/or a wholly owned subsidiary of the [Fund]) until such time that each Project or each ProjectCo is sold or transferred (other than pursuant to any sale-leaseback financing)*; provided, however, that the [Fund] may grant non-voting profit interests in one or more ProjectCos to third parties in

---

[4] The parties amended the operating agreement on several occasions. *See* JX 14; JX 174; JX 175; JX 396. None is significant for purposes of the case, except for the amendment dated March 30, 2016, that added HOMF as an Investment Member. PTO ¶ 31. For purposes of this litigation, the parties agree that the governing version of the operating agreement is the Amended and Restated Operating Agreement of VERT Solar Fund I, LLC, dated March 30, 2016. JX 396 (the "Operating Agreement" or "Op. Agr."); *see* PTO ¶¶ 24–27, 29, 31, 35. Unless otherwise noted, all citations in this decision are to the March 2016 version.

17

consideration of services rendered by such third parties to the applicable ProjectCo(s).

Op. Agr. § 1.2 (emphasis and formatting added). The Operating Agreement defined a "Project" as "a renewable energy development project selected by the Manager for investment by the [Fund]." *Id.* at 24 sched. 2. It defined a "ProjectCo" as "each Delaware limited liability company to be owned and managed by the [Fund], whose sole purpose is to develop, hold the assets of, construct, own, operate, maintain and obtain take-out project finance for each Project and/or otherwise dispose of such Project or its assets." *Id.* The purpose clause thus reflected the parties' business agreement that Finance and the Fund would create and operate through project companies owned by the Fund (the "Project Company Requirement").

The Operating Agreement divided the Fund's members into a "Management Member" and the "Investment Members." The original Investment Members were Jefferson and OBD Partners. Jefferson agreed to commit total capital of $2 million, and OBD Partners agreed to commit total capital of $500,000. PTO ¶ 36. The Fund's total available capital was thus $2.5 million. *See* JX 174 at '646; JX 175 at '380.

The Operating Agreement established a manager-managed governance structure and appointed Finance as the Manager. Op. Agr. § 5.1. Under the Operating Agreement, Finance had "full, exclusive and complete discretion in the management and control of the business and affairs of the [Fund], subject to Section 5.2 . . . ." Op. Agr. § 5.1A.

There were, however, two significant limitations on Finance's ability to take action. The first concerned capital calls. Until it reached its total capital commitment, each

18

Investment Member was obligated to fund a capital call within five business days after receiving a notice that provided the following information:

(i) the aggregate amount requested from all Investment Members,

(ii) the amount requested from such Investment Member, and

(iii) a description of the projected uses of such funds, including the following information with respect to each new Project selected by the Manager:

(a) Project description;

(b) Capital Requirements;

(c) Project status and permitting status;

(d) Transaction status;

(e) Financial model and indicative returns;

(f) Risks identified; and

(g) Projected timetable.

Op. Agr. § 3.2B (the "Capital Call Provision") (formatting added).

Although the Capital Call Provision generally obligated the Investment Members to fund capital calls once Finance provided the requisite information, it was subject to a proviso: "Notwithstanding the foregoing, an Investment Member shall not be required to make any additional Capital Contributions . . . until the [Fund] has made apportionments (and distributions, if applicable) of Available Cash attributed to the long-term financing of the [Fund]'s initial Project . . . ." *Id.* Through this proviso, the Operating Agreement memorialized the parties' agreement to start with a single project, which Jefferson and Murphy understood to be Project Cali. The Investment Members were not obligated to fund

19

any additional capital calls until the Fund had refinanced its initial project with long-term financing, *i.e.*, once the initial project had reached COD.

The second major limitation appeared in Section 5.2B and required Finance to obtain approval from a majority of the Investors before taking certain actions. It stated:

> Notwithstanding any [*sic*] to the contrary contained herein, the Manager and the [Fund] are expressly prohibited from taking the following actions without the prior approval of the Investment Members holding a majority of the IM Percentages:
>
> (i) Acquire any equity or debt securities, other than securities issued by a ProjectCo for a Project;
>
> (ii) Incur indebtedness other than in the ordinary course of business;
>
> (iii) Take any action in contravention of this Agreement;
>
> (iv) Possess property, or assign rights in specific property, for other than a [Fund] purpose;
>
> (v) Voluntarily take any action that would cause a bankruptcy of the [Fund] or file the [Fund] in bankruptcy;
>
> (vi) Change significantly the nature of the [Fund]'s business;
>
> (vi) Admit any additional Members other than pursuant to this Agreement; and
>
> (vii) Effect any transaction between the [Fund] and any Manager, any Investment Member, the Management Member, or any of their respective Affiliates.

Op. Agr. § 5.2B (the "Investment Member Approval Requirement").

In Section 3.3, the Operating Agreement memorialized the agreement that the Investment Members could withdraw their capital from the Fund after a successful project. That provision gave each Investment Member "the right, exercisable from time to time in its sole discretion, to demand that with respect to any one or more Projects, the [Fund]

20

make a distribution to the Investment Member from Available Cash attributable to such Project(s) in an amount equal to the Investment Member's Unreturned Capital Contribution with respect to such Project(s) . . . ." Op. Agr. § 3.3 (the "Capital Withdrawal Provision").

For purposes of distributions from each project, the Operating Agreement stated that proceeds first would be allocated to return the Investment Members' capital. Op. Agr. § 4.2(i). The remaining proceeds, reflecting profits, would be distributed with 50% going to the Investment Members and 50% to the Management Member. Op. Agr. § 4.2(ii). The Investment Members' share of capital and profits would remain in the Fund and would be available for reinvestment unless an Investment Member exercised its right to withdraw capital under the Capital Withdrawal Provision.

Finally, the Operating Agreement memorialized the parties' agreement that Finance could receive fees for managing individual projects in addition to participating in the upside with the Investment Members. Section 2.9 of the Operating Agreement stated that Finance

> may receive compensation for services rendered to or on behalf of any Project, and that such compensation shall be treated in each case as (i) a capitalized expense of the Project prior to the Project's Commercial Online Date ("*COD*"); provided, however, such capitalized fees shall not exceed $170,000 per MW for such Project prior to COD, and (ii) an operating expense of the Project after COD; provided, however, such operating expense fees shall not exceed 3% of revenues for such Project.

Op. Agr. § 2.9 (emphasis in original); *see* JX 143 at '394.

## F.    The Five-Month Delay

On June 11, 2015, the same day that that the Operating Agreement was signed, Jefferson and Murphy each wired $500,000 to the Fund. PTO ¶¶ 37–38. They expected

21

Altenberg to tell them that Project Cali was moving forward. They heard nothing. Murphy Tr. 763–64, 769–70.

Instead, Altenberg issued a misleading press release in which he claimed that *Finance* had secured a $2.5 million investment. JX 185. The announcement was titled "Houston energy tech company closes investment round, prepares for acquisition" and claimed that "Vert Solar Finance, a solar power project acquisition platform, has raised $2.5 million as it prepares to acquire solar projects around Houston and the United States." *Id.* But Jefferson and Murphy had not invested in Finance; they invested in the Fund.

At the end of the month, Altenberg told Jefferson that Project Cali was on hold. *See* JX 1502. On July 2, 2015, Murphy emailed Altenberg and asked about the project:

> I was curious as to the progress on the California City investment and recently speaking with Brett on other matters was surprised to learn that it appears to have fallen through at least for the time being. Although hopefully that is not the case, I would appreciate it if you could let me know its status and any planned next steps.
>
> *As it was the first and principal investment we funded*, clearly I am interested in status from time to time[,] particularly significant changes when known.

JX 1502 (emphasis added); *see* Murphy Tr. 764. This email corroborates Jefferson and Murphy's testimony that Project Cali would be the Fund's first project. Murphy Tr. 768.

In early August 2015, Altenberg emailed Jefferson and Murphy that he was focused on acquiring projects and developing relationships with engineering partners. JX 162. His email included a "Pipeline report," which described projects that he was investigating. *Id.*

In early September 2015, Altenberg told Jefferson that Project Cali was not going forward. Jefferson Tr. 43; Murphy Tr. 769–70. Altenberg sent Jefferson another update

22

and attached a pipeline report. JX 205. When Jefferson called him, Altenberg said that "he ha[d] a plethora of deals." JX 204. Jefferson shared that information with Murphy. JX 204; JX 205.

Murphy was concerned. He believed that the Fund was going to invest in Project Cali, and he reminded Jefferson that the Operating Agreement "did not contemplate [the Fund] with no projects." JX 207. He reached out to Altenberg to schedule a call. JX 210. Altenberg emailed back that Finance was "in the final throws [*sic*] of putting together the first project," which he described as "a 513 kW project in Newark, NJ," and asked for "a couple more days to finalize the terms . . . ." JX 222. Altenberg also represented that "[b]ehind this we have 50MWs of projects in various stages of perfecting and it is going to be an exciting year." *Id.* The Newark project never materialized. Altenberg Tr. 568.

On November 2, 2015, Murphy again emailed Altenberg to ask about the delay in finding a project and whether it was "time to consider returning [our] initial investment until such time as it is needed." JX 222. The plaintiffs learned through discovery that Altenberg could not have returned their money because he already had used some of it to reimburse himself for expenses associated with setting up the Fund. Altenberg Tr. 560–61.

The next day, Altenberg reassured Murphy that Finance had "been making tremendous progress on the pipeline" and that he had "just arrived into New York to finalize our pipeline agreement with Blue Sky Utility." JX 223. Altenberg also sent an updated project pipeline. JX 224. Murphy responded, "[W]e need to see a live deal before years [*sic*] end," and he told Altenberg that he wanted to meet with him in person while Altenberg was in New York. JX 225.

23

Murphy and Altenberg met at Michael Jordan's Restaurant in Grand Central Station. Murphy Tr. 828. Murphy bluntly conveyed his disappointment about the Fund's failure to proceed with Project Cali, and he asked for his money back. Altenberg stressed to Murphy that he expected to sign an agreement with Blue Sky Utility LLC that night. Murphy told Altenberg that if the agreement did not result in a project, he wanted his money back. *See* JX 233.

## G.    The Blue Sky Agreement

On November 4, 2015, Finance entered into a Solar Development Asset Purchase Agreement with Blue Sky under which Finance purchased the rights to twenty-one solar projects that Blue Sky was developing in California (the "Blue Sky Portfolio"). PTO ¶ 48; JX 226. The projects had a nameplate capacity of 13.68 megawatts. JX 226 at 3 (Recital A). Finance agreed to pay (i) $150,000 for each megawatt that a project produced when completed, plus (ii) the development costs for the project, which would become due as Blue Sky achieved milestones set forth in the agreement. At closing, Finance became obligated to pay the "Cash Advance," defined as 20% of the aggregate pre-development fee for an 8-megawatt portion of the projects, *plus* 20% of the estimated development cost for that portion of the projects. *Id.* §§ 1.1.19, 2.2.2. The pre-development fee was equal to $150,000 per megawatt. *Id.* § 2.2.1. The estimated development was $170,000 per megawatt. JX 1486 at 3. Finance thus became obligated at closing to pay $512,000 to Blue Sky, plus additional fees over time as Blue Sky achieved project milestones. Finance also agreed to give Blue Sky a 15% equity interest in each project. In substance, Finance was

buying the nascent projects, paying Blue Sky to complete them, and granting Blue Sky an equity interest in the projects as a co-developer.

On November 5, 2015, Altenberg emailed a copy of the Blue Sky agreement to Jefferson and Murphy, writing, "[W]e finally have the contracts in place and structure for what we all expect to be a fruitful and long relationship. We will begin construction on the first project with Blue Sky immediately and you will find the initial pipeline included in the contract." JX 230.

By acquiring the Blue Sky Portfolio, Altenberg took a very different approach than what the parties originally contemplated. Instead of pursuing a single project to completion as proof of concept, Altenberg acquired a portfolio of twenty-one projects. At trial, Altenberg claimed that he planned to proceed first with the projects that were closest to NTP (*i.e.*, the preliminary work was finished) and to devote the Fund's limited resources to those projects. Altenberg Tr. 359. The reality was that Altenberg had committed Finance to projects that required more equity than Jefferson and Murphy had committed to invest.

During this litigation, Altenberg admitted that by acquiring the Blue Sky Portfolio, he was no longer adhering to his agreement with Jefferson to pursue one project at a time. Altenberg Dep. (Aug. 28, 2018) 493–95. He claimed that Finance "was acquiring the projects in anticipation of selling them into the Fund to build up a pipeline." *Id.* at 497. He claimed that he "didn't know which projects were going to ultimately be approved into the Fund, which is why we built up a pipeline." *Id.* He also contended that "the Fund owners" would make a decision as to whether a project received "acceptance back in the Fund." *Id.* at 499. This testimony was not credible. Neither the parties' business deal nor the Operating

25

Agreement contemplated Finance initially buying projects and then later selling them to the Fund. Moreover, Altenberg used the Fund's capital to acquire the Blue Sky Portfolio. The Fund thus was paying for the projects, not Finance. In his post-trial submissions, Altenburg has denied vigorously that the "Fund owners" had any right to approve what projects were acquired by the Fund. *See, e.g.*, Dkt. 279 at 35–43.

**H.    The Placerville, Orland, And Hanford Projects**

On November 16, 2015, Altenberg told Jefferson and Murphy that work would begin on the first three Blue Sky projects, which were located, respectively, in Placerville, Orland, and Hanford, California. He provided project summary reports that included an overview of each project and preliminary financial analysis. JX 235; JX 242.

The total estimated cost of the Placerville project was $1,765,000, with an equity investment from the Fund of $353,000. JX 240 at '388; JX 242 at '267. The total estimated cost of the Orland project was $1,928,000 with an equity investment from the Fund of $385,600. JX 240 at '389; JX 242 at '261. The total estimated cost of the Hanford project was $5,032,000, with an equity investment from the Fund of $1,006,400. JX 240 at '388; JX 242 at '255. The total construction cost for the three projects thus was approximately $8.725 million, with a total equity investment from the Fund of $1.745 million. JX 241. At the time, Altenberg only had capital commitments from the Investment Members totaling $2.5 million. Committing to the Placerville, Orland, and Hanford projects left Altenberg with $755,000 in available capital.

On November 17, 2015, Altenberg, Jefferson, and Murphy met to discuss these projects. JX 240. Jefferson and Murphy approved them. PTO ¶¶ 52, 55, 59. That same day,

26

Altenberg wired $512,000 from the Fund's bank account to Blue Sky Utility LLC. PTO ¶ 49.

On November 30, 2015, Altenberg formed VSF Blue Sky Portfolio I LLC (the "Blue Sky ProjectCo") as a project company for all of the projects in the Blue Sky Portfolio. PTO ¶ 60. He also executed an assignment agreement between Finance and Blue Sky ProjectCo, which he backdated to November 4, 2015. *Compare* JX 258, *with* PTO ¶ 61. The Fund owned 85% of Blue Sky ProjectCo, and Blue Sky owned the remaining 15%. But contrary to the Project Company Requirement, Altenberg did not complete the paperwork necessary to actually transfer the rights to the projects from the Finance to the Blue Sky ProjectCo. The transfer was not completed until February 2017, after the parties' relationship had broken down. *See* JX 947. Also contrary to the Project Company Requirement, Altenberg never created individual project companies for the projects in the Blue Sky Portfolio.

Shortly after work began on the Placerville, Orland, and Hanford projects, a team from Hildene explored whether the Fund would be a worthwhile investment opportunity for one of its funds. *See* JX 251. Several Hildene employees held a call with Altenberg, who told them that the Fund needed an additional $12.5 million to fund its current pipeline of projects. JX 262. Altenberg already could not finance his pipeline using his existing capital. Jefferson signed off on Hildene making an investment, and Altenberg and the Hildene employees began working on the documents. *See* JX 268.

In late November 2015, Altenberg began working with DynaSolar EPCM, LLC ("DynaSolar"), a consulting firm that provided engineering, procurement, and project management services. JX 246; Altenberg Tr. 439. On December 30, 2015, Finance entered

into a Master Consulting Services Agreement with DynaSolar to provide engineering and project management services for the Fund's projects. PTO ¶ 62; JX 271. The consulting agreement called for DynaSolar to work on a minimum of 8 megawatts worth of projects and to receive a minimum fee of $640,000. JX 271 at 32, 35; Altenberg Tr. 582–83. Altenberg expected the Fund to pay DynaSolar's fees. *See* Altenberg Tr. 583.

Altenberg testified that he hired DynaSolar because he had never handled the details of a solar project, so he needed "very experienced engineers" for support. JX 1198 at 176. Among other things, he wanted DynaSolar "to oversee the work of the construction team." Altenberg Tr. 439. Jefferson and Murphy were surprised to learn that Altenberg had hired DynaSolar because they thought that Altenberg would be handling some of the tasks that the services agreement assigned to DynaSolar. Jefferson Tr. 69–70, 222.

## I.      The Sunrise Projects

After work started on the Placerville, Orland, and Hanford projects, Altenberg began sending weekly updates to Jefferson and Murphy. On January 26, 2016, he sent a weekly update that mentioned an "[i]ntroduction to Sunrise Energy." JX 304 at '368. The next weekly update described Sunrise Energy has having (i) a 400-kilowatt project in Bakersfield, California, and (ii) "what could prove to be a large portfolio of 1-3 MW projects in Pennsylvania." JX 319 at '387.

A few days later, Altenberg reported that DynaSolar was looking into buying solar panels "on the secondary market" so that the Fund could use them "to maximize the IRR and lower project costs across the portfolio." JX 326 at '438. A week later, Altenberg reported that DynaSolar had "located approximately 8.3 MW of tier 1 solar modules for

28

sale on the secondary market . . . ." JX 329 at '238. There also was bad news on the Hanford project; the site needed a new roof and the quote was more than twice the amount that Altenberg had expected. *Id.* at '239.

By this point, Altenberg had started working with BrightPower, Inc., an affiliate of Blue Sky, to provide engineering services for the Blue Sky Portfolio. He caused the Blue Sky ProjectCo to enter into an agreement with BrightPower, calling the document a "Limited Notice to Proceed." *See id.* at '039. Altenberg's "Limited Notice to Proceed" was different than a "Notice to Proceed," which marks the point when a municipality or county determines that a project can start construction. Altenberg's "Limited Notice to Proceed" simply meant that he was instructing BrightPower to start work on documentation. *See* JX 331 at '826.

On February 18, 2016, the Fund entered into a Solar Development Asset Purchase Agreement with Sunrise Energy, under which the Fund (i) acquired the Bakersfield project and (ii) purchased options on the Pennsylvania projects. PTO ¶ 66; *see* JX 330. The basic structure of the deal paralleled the acquisition of the Blue Sky Portfolio. The Fund agreed to pay $175,000 for the Bakersfield project, with $17,500 due at closing, plus additional payments according to a schedule set forth in the agreement. JX 330 §§ 1.1.16; 2.2.1. For the Pennsylvania projects, the Fund agreed to pay $50,000 per megawatt at completion according to a schedule set forth in the agreement. *Id.* § 2.2.2.

On February 23, 2016, Altenberg informed Jefferson and Murphy by email that he had signed the agreement with Sunrise Energy. JX 339 at '086. He identified the "VERT Portfolio" as consisting of five projects: the Orland, Placerville, and Hanford projects from

Blue Sky, the Bakersfield project from Sunrise Energy, and an additional project from Sunrise Energy in Licking Creek, Pennsylvania. *Id.* at '088. Altenberg reported that the Orland, Placerville, and Hanford were four months behind schedule. *Id.* at '086.

In his update, Altenberg provided the following breakdown of how the Investment Members' initial contribution of $1 million had been spent:

| Description | Debit | Balance |
|---|---|---|
| BlueSky Utility | $512,000 | $488,000 |
| VSF Acq Exp | $148,985 | $339,015 |
| Legal Svcs | $103,080 | $235,935 |
| Insurance | $16,999 | $218,936 |
| Accounting | $3,827 | $215,109 |
| Bank Fees | $467 | $214,642 |

*Id.* Altenberg then stated that he would need $250,000 for the Bakersfield project, another $1,150,000 for the Hanford project, and $250,000 for a deposit on $4 million worth of solar panels. *Id.* The identified needs totaled $1,650,000, excluding the balance due for the solar panels. Altenberg nevertheless identified a "Funds Needed" figure of $509,627. He attached two funding requests, one for $365,736 for the Orland project and another for $358,533 for the Placerville project. Those requests did not add up to $509,627 either. *See id.* at '093, '103.

After receiving Altenberg's report, Murphy emailed Jefferson to express concern that the Fund was working "a bit different then [*sic*] I think was envisioned at the get go." JX 343 at '962. He asked Jefferson for a call "to make sure we are on the same page." *Id.* At the time, Jefferson was not paying close attention, and he was not worried about the sums involved. He emailed an investor who previously had asked him about Altenberg, writing, "Joaquin is starting to fund and it looks really interesting." JX 342.

On February 26, 2016, Jefferson and Murphy each contributed an additional $255,000 to the Fund. JX 356; JX 1496. This contribution brought their total amount invested capital to $1.51 million, with $990,000 remaining on their commitments. The Fund did not have enough capital to fund the $1,650,000 in uses that Altenberg had identified, much less to pay what Altenberg had indicated would be an additional $3.75 million to complete the purchase of the solar panels.[5]

## J.    Altenberg Looks At More Projects.

During March 2016, Altenberg sent updates to Jefferson and Murphy in which he reported that he was investigating still more projects in Michigan, Puerto Rico, the Virgin Islands, Hawaii, and California. JX 369 at '361; JX 373 at '283. In addition to the new projects, Altenberg reported that Blue Sky was moving forward with two additional projects from the Blue Sky Portfolio—Quincy and Colusa—and expanding the Placerville project. JX 369 at '361.

On March 29, 2016, Altenberg reported that he was examining "the Georgia Avocado portfolio of projects proposed by Beltline Solar for construction this year." JX 395 at '235. What became known as the "Beltline Portfolio" consisted of "about twenty-two . . . projects totaling approximately 34 [megawatts]." *Id.* Altenberg also said that he was evaluating a new project in Farmington, Illinois. *Id.* at '234, '235; JX 379 at '290. In

---

[5] At around this time, Jefferson and Murphy agreed that as between themselves, they would split the $2.5 million that they had originally agreed to contribute, with each responsible for $1.25 million. *See* JX 851 at '573; JX 905 at '456; Altenberg Tr. 403. This decision continues to use the capital commitments set forth in the Operating Agreement.

the same update, Altenberg reported that he planned to close the following week on the purchase of 8.3 megawatts of solar panels. JX 395 at '234, '235.

## K.    HOMF Invests In The Fund.

On March 30, 2016, HOMF formally became an Investment Member in the Fund. *See* JX 387; JX 396. At the time, HOMF was a subsidiary of Hildene Opportunities Fund II. Jefferson Tr. 8.

HOMF committed to contribute up to $5 million in capital and wired the Fund an initial capital contribution of $3.02 million. PTO ¶ 43; *see* Op. Agr. at 21 sched. 1. Before HOMF invested, Jefferson and OBD Partners had provided the Fund with $1.51 million in capital, and they had $990,000 remaining on their commitments. HOMF's investment brought the total investment in the Fund to $4.53 million, with $2.97 million remaining in untapped commitments.

## L.    Altenberg Buys The GCL Panels.

On April 1, 2016, Altenberg executed an agreement between the Fund and GCL Solar Energy, Inc. to purchase 8.3 megawatts of solar panels (the "GCL Panels") for $3,625,126.88. PTO ¶ 97; JX 416. When Altenberg pitched Jefferson and Murphy on investing in the Fund, he never suggested having the Fund purchase solar panels or other hard assets. The Fund only was going to own project companies.

The GCL Panels were sold "as is," with the seller disclaiming all warranties. JX 416 § 9. The GCL Panels had been sitting in a warehouse for several years and thus were not the latest technology, but they were new in the sense that they had never been taken out of the packaging. DynaSolar had recommended purchasing them. *See* PTO ¶ 98; JX 326 at

32

'438. Altenberg did not do any of his own due diligence before purchasing the GCL Panels, and he allowed DynaSolar to negotiate the contract for him. JX 1198 at 232.

At trial, Altenberg claimed that the GCL Panels would have paid for themselves because Finance could have used them on the Fund's projects to lower the cost and increase returns. Altenberg Tr. 445. The issue was timing. Altenberg had to pay for the GCL Panels at closing, yet the Fund would not reap any benefits from having the GCL Panels until projects reached COD and were refinanced, which would not happen for months (or longer), if ever. As it happened, the GCL Panels could not be used in any of the Fund's projects.

In April 2016, Altenberg began negotiating for Finance to acquire an interest in DynaSolar. JX 456. Altenberg justified the transaction as a means of acquiring an engineering team and yet another portfolio of projects. Altenberg Tr. 440–41. Altenberg testified at trial that the DynaSolar acquisition would bring "a huge portfolio" of over 1,000 megawatts of commercial and industrial projects to the Fund. Altenberg Tr. 441.

Altenberg spoke to Jefferson about the deal with DynaSolar. Altenberg Tr. 442. Jefferson regarded it as a transaction involving Finance that did not affect the Fund. *See* Jefferson Tr. 60. Jefferson told Altenberg that if he thought it was good for his business, then he should do it. Altenberg Tr. 442–43.

On May 1, 2016, Finance entered into an agreement to purchase a 60% membership interest in DynaSolar for $7 million (the "DynaSolar Acquisition"). PTO ¶ 72; JX 475. The agreement obligated Finance to pay $3.5 million to DynaSolar on May 1, 2016; $1.75 million one year later; and another $1.75 million the year after that. JX 475 at 2, 17.

33

Altenberg claimed at trial that he thought the transaction "wasn't going to require any capital from the Fund." Altenberg Tr. 443. In reality, as he testified in a different action, he planned to use money that he already had drawn from the Fund and tell the Investment Members that the money was being used to purchase the rights to projects that DynaSolar would provide to the Fund. JX 1205 at 30–31.

At trial, Altenberg claimed that the DynaSolar transaction would pay for itself because DynaSolar had a portfolio of "over a thousand megawatts" of projects. Altenberg Tr. 441, 443. As with the GCL Panels, the obvious problem was timing. A payment of $3.5 million was due at signing, yet the DynaSolar projects would not generate cash flows until they reached commercial operation at some indefinite point in the future. *See* Altenberg Tr. 704.

## M.    The Beltline Portfolio.

On May 4, 2016, Finance entered into a Solar Development Asset Purchase Agreement with Beltline Energy to acquire the Beltline Portfolio. PTO ¶¶ 70; JX 480. Under the Beltline asset purchase agreement, Finance committed to pay $50,000 per megawatt for sixteen "Awarded Projects," totaling 24.01 megawatts, that Georgia Power Company had approved for development. *See* JX 480 § 2.2, Ex. A. Finance acquired a right of first refusal on a series of projects totaling another 9.68 megawatts that were "Waitlisted." *See id.* § 5.3, Ex. A. Ten percent of the purchase price for the Awarded Projects ($120,050) was due at closing, with another 40% due at NTP and the final 50% due at completion. *Id.* § 2.2. At closing, Finance also had to reimburse Beltline Power for deposits in the amount of $168,300. *Id.* § 2.2.2. Contrary to the Project Company

34

Requirement, Altenberg never assigned the rights to the projects to the Fund and never created project companies for them.

When Altenberg entered into the asset purchase agreement for the Beltline Portfolio, HOMF, Jefferson, and OBD Partners had provided the Fund with $4.53 million in capital and had $2.97 million remaining on their commitments. Altenberg estimated that it would require $7.86 million of equity to complete the Awarded Projects. *See* JX 581 at '044. Altenberg also had committed the Fund to pay $3.6 million to purchase the GCL Panels. And he was still in the midst of developing the six projects from the Blue Sky Portfolio and two from Sunrise Energy.

## N.    The Houston Meeting

After hearing about the Beltline Portfolio, Jefferson and Murphy became concerned. Jefferson Tr. 81. Murphy was scheduled to travel to Houston to visit his cousin, and he asked to meet with Altenberg in person at Finance's office. *See* JX 509; Murphy Tr. 780–81.

The meeting took place on June 15, 2016. *See* PTO ¶ 105; JX 536. Jefferson sent Jason Spear, a Hildene analyst, to attend in his place. Jefferson Tr. 81. Spear had been monitoring HOMF's investment in the Fund since April 2016. *See* JX 424; JX 427; JX 443. Spear reviewed the weekly reports, summarized them for Jefferson, and shared his analysis with Murphy. *See* JX 443; JX 453.

Spear had worked with Altenberg to establish a "tracker" system that categorized progress "on a scale of 1-5." JX 449. Spear had proposed the following scale:

1 – conducting initial diligence/site review/prepping RFPs

35

2 – physical construction initiated and less than 50% complete

3 – construction more than 50% complete

4 – solar site fully functional

5 – deal refinancing and equity is ready to be rolled into next deal.

JX 449 at '332. Altenberg revised phase 2 to delete the word "physical," claiming that phase 2 was "broad" and should include "engineering design and component procurement" and "mobilization" in addition to "physical construction." JX 449 at '331. Under his revised system, Altenberg could categorize projects as having reached the construction phase even though physical construction had not begun.[6]

> In preparation for the Houston meeting, Murphy told Altenberg that he wanted to
>
> discuss the business model a bit on a project basis and the current success in moving those projects underway or soon to be into a refinancing position. From weeklies see that there is a lot of action and want to make sure we are getting to finish/refinance with sort of metrics that provide comfort and scalability.

JX 536. In other words, Murphy wanted Altenberg to complete a project.

---

[6] *See, e.g.*, JX 527 at '577. Later, Altenberg unilaterally changed the categorization so that phase "2" simply meant that the Fund had invested equity and phase 3 referred to different levels of construction, including "3.1 – Construction Prep / EPC," "3.2 – Construction Funding," "3.3 – Construction Financing in Place. Procurement / site prep," "3.4 – Mid-Construction," and "3.5 – End-Construction." JX 484 at '515; *see* Spear Tr. 862–63. This revised categorization was misleading because it made projects seem further along in the development and construction process, *i.e.*, they were closer to 5, than they would have seemed if they instead had been categorized according to Spear's tracker system. Spear Tr. 862–63 ("Q. And what does status 3.4 mean now? A. Well, apparently that's the old 2. Q. So if you did didn't realize that changes had been made to the status key and you were looking at the project status, what would you have thought a ranking of 2 meant? A. You would think that a project was nearing 50 percent completion.").

Murphy's cousin ran an investment fund, and Murphy brought him along to the meeting. Altenberg viewed Murphy's cousin as a potential investor, and he began the meeting by giving Murphy, his cousin, and Spear a presentation that largely consisted of the same slides he had used when soliciting Jefferson and Murphy to invest. *See* JX 19; Murphy Tr. 783–84. As with his pitch to Jefferson and Murphy, Altenberg represented that "[t]he key is equity recycling." JX 543 at '698. He also claimed that Open Energy provided both construction financing and long-term debt for Finance's projects. *Id.* He claimed that Finance was "one of [Open Energy's] pipelines" and that "[t]he majority of loans they do each month is VERTs." *Id.*; *see* Spear Tr. 864 ("He told us that things are going very well with Open Energy."). One of the new pages in the presentation was titled "Active Pipeline Summary – *Past 4 months*." JX 19 at 12 (emphasis in original). It listed 111.10 megawatts of projects, with a notation that "[t]his is a subset of over 650MWs currently in the pipeline [and] does not include 35 MW in GA and 18 MW in MA." *Id.* Referring to the 111.10 megawatts of projects, Altenberg represented that "[a]ll projects can begin construction within the next 3 months or are already proceeding." *Id.* At the time, Altenberg did not have any projects in the construction phase.

After the meeting, Altenberg sent Spear a two-page summary of how the Fund operated. Dated September 2015, it included a flow chart for a representative solar project during three phases of ownership: (i) before NTP, (ii) post-NTP and pre-COD, and (iii) post-COD. Consistent with Altenberg's representations to Jefferson and Murphy, the flow chart showed the Fund owning the project through a project company from the time the project was acquired. It showed the Fund investing in the project company to bring the

37

project to NTP. It then showed the Fund investing in the project company at NTP as part of the construction financing. It then showed Finance receiving its developer's fee at COD as an expense paid by the project company. *See* JX 538.

Murphy and Spear asked about the Fund's ability to develop the Beltline Portfolio. Altenberg said that he was "not necessarily moving forward" with the projects because he was "[n]ot seeing the returns they wanted to see." JX 543 at '699. Altenberg admitted that he did "not have enough capital to complete the project." *Id.* He also explained that the Fund already had invested $522,000, including $168,000 in deposits. *Id.* Murphy was disappointed and said they would need to schedule a call with Jefferson to determine "what happened and where mistakes were made." *Id.*

Murphy and Spear also asked about the GCL Panels. *Id.* Altenberg said that he was moving forward with the purchase because "they can put them anywhere or sell them if they need to." *Id.* He argued that it was "[d]ifficult to procure equipment," so the purchase had been a good idea. *Id.* Altenberg described the GCL Panels as "brand new" and "still in the box." Altenberg Tr. 653 (playing audio clip from JX 5188D). The GCL Panels were still in their boxes, but they were not "brand new." They were between three and five years old.

Murphy told Altenberg that he needed to complete a project. Altenberg claimed that the Placerville and Orland projects could be completed by September 2016. JX 543 at '700; *see* JX 544. He also claimed that he was in conversations to raise another $10 to $12.5 million for the Fund. JX 543 at '700. Neither statement appears to be accurate.

38

A follow-up call with Jefferson took place on June 27, 2016. JX 570 at '722; *see* Jefferson Tr. 84–85. Murphy asked Altenberg why he had signed the deal for the Beltline Portfolio despite not having the capital to complete the projects. JX 570 at '722. Altenberg claimed that aspects of these projects were "top-notch." *Id.* Jefferson asked Altenberg why he was not doing a series of small deals as they had originally agreed, and Murphy pointed out that Altenberg had yet to put together a construction financing package. *Id.* Jefferson told Altenberg that he needed to complete a project. *Id.*

Also on the call, Altenberg told Jefferson and Murphy that he needed another $1.5 million in capital to satisfy the contractual commitments that he had made under the Beltline asset purchase agreement. *Id.* at '723 He also said that he needed another $1 million in financing to complete the existing Blue Sky projects. *Id.* Altenberg claimed that he could complete at least one of the six California projects by the fourth quarter of 2016. *Id.*; *see* JX 566.

## O.    A Month Of Bad News

In early July 2016, Altenberg discovered that the GCL Panels could not be used in any of the Fund's projects. DynaSolar had made a mistake. Altenberg began to look into reselling the panels, but it would mean taking a loss. JX 588 at '341. He also learned that panel prices were dropping, so the loss would get bigger over time. *See* JX 605 at '500.

Later that month, DynaSolar notified Altenberg that Finance was in breach of the DynaSolar Acquisition agreement because Finance had not (i) paid the $3.5 million due at closing, (ii) provided draft employment agreements for the two principals of DynaSolar, or

(iii) provided other necessary documentation. JX 598. DynaSolar was Altenberg's principal consultant for all of his projects. *See, e.g.*, JX 596.

Contemporaneously, Altenberg told Jefferson and Murphy that he actually would need approximately $1.7 million in capital to meet his obligations for the Beltline Portfolio. JX 603 at '327; Murphy Tr. 789; *see* JX 605; JX 1198 at 152. On July 27, 2016, Altenberg then noticed a capital call for $1.8 million. JX 614. After satisfying the capital call, HOMF, Jefferson, and OBD Partners had invested $6.33 million, with $1.17 million in untapped commitments. *See* JX 1496.

When noticing the capital call, Altenberg sent Jefferson and Murphy a memorandum arguing why they should continue to develop the Beltline Portfolio. JX 614 at '981. Jefferson and Murphy told Altenberg to sell the Beltline Portfolio and recover the Fund's money. Jefferson Tr. 84–85.

## P.    Things Fall Apart.

Over the next five months, Altenberg's business unraveled as he simultaneously tried to accomplish all of the following tasks:

- meeting his contractual obligations under the Beltline asset purchase agreement;

- selling the Beltline Portfolio;

- minimizing the loss on the GCL Panels;

- resolving the dispute with DynaSolar;

- moving forward with the three original Blue Sky projects (Hanford, Orland, and Placerville), plus the three additional Blue Sky projects (Quincy, Colusa, and the Placerville expansion), and the Sunrise Energy project in Bakersfield.

40

Altenberg testified that during this time, the Beltline projects were "in flux" and the Blue Sky and Sunrise Energy portfolios "had their own issues." JX 1198 at 114. As a result, "There was [*sic*] literally fires going off constantly. Everything was going wrong." *Id.* He quite obviously had taken on too much.

To his credit, Altenberg succeeded in selling the Beltline Portfolio, although not without additional capital from the Investment Members. On September 22, 2016, Altenberg was forced to notice another capital call, this time for $500,000, to fund additional costs associated with the Beltline Portfolio. PTO ¶ 75. The Investment Members funded the capital call on the same day, bringing their total investment in the Fund to $6.83 million. At this point, the Fund had only $670,000 in untapped commitments.[7]

By the end of October 2016, Altenberg had contacted twenty-two bidders who showed varying levels of interest in the Beltline Portfolio. *See* JX 712 at '568. During November, he engaged with one of the bidders, Boviet Solar USA, LLC ("Boviet"). JX 743. In late November 2016, Boviet signed a term sheet to purchase the Beltline Portfolio for $2.3 million, plus a development of $0.025 per watt. JX 484; JX 743. The Beltline Portfolio totaled 35 megawatts, so the development fee could have been as high as $875,000. *See* JX 484; JX 743. Altenberg expected it to be $625,000. JX 278 at '337. Finance later accrued a receivable of $634,200 for the fee. JX 745 at 17; Altenberg Tr. 639–40. Altenberg represented to Jefferson and Murphy that at least a portion of the fee

---

[7] Due to a ministerial error, Jefferson omitted $50,000 from his September 2016 contribution. He provided the additional funds in December 2016. *See* JX 5; JX 1496.

would be returned to the Fund. *See* JX 816 ("[W]e have secured a development fee on top of the funds that are expected to generate additional proceeds to the Fund of $300k - $400k depending on the ultimate number of projects. This would result in $1.1x - 1.2x$ money on an approximate 6 month investment"). Altenberg later reneged on that commitment.

The projects in the Blue Sky Portfolio did not fare as well. Even before Finance acquired the Beltline portfolio, Altenberg had been dissatisfied with Blue Sky's work. He felt that Blue Sky was not "getting the documentation" completed, and his relationship with Blue Sky "started getting very tense." Altenberg Tr. 450.

After Finance acquired the Beltline Portfolio, the situation with Blue Sky worsened. Most of the projects in the Blue Sky Portfolio remained in the development stage. Altenberg and Blue Sky began having disputes, and the principal projects suffered setbacks. At Hanford, Finance eventually was able to obtain a building permit, but the project nevertheless remained stalled: the site required a new roof, the lease obligated the project developer to provide it, and that requirement made the project infeasible. *See* JX 765 at '582. Finance sold the Hanford project back to Blue Sky. JX 1198 at 71–72. Problems also emerged on the Orland and Placerville projects because the owners had credit issues, the engineering documents were flawed, and the leases had problems. JX 7 at '612–13. By the end of 2016, Blue Sky still had not brought a project to NTP. Altenberg Tr. 463. Altenberg declared Blue Sky in default under the contract. *Id.* at 464.

The situation with Sunrise Energy also had deteriorated. After a dispute with Altenberg, Sunrise Energy terminated the asset purchase agreement and initiated dispute

42

resolution proceedings. *See* JX 765 at '582; JX 758; JX 792. In December 2016, Sunrise Energy commenced an arbitration. PTO ¶ 67.

Altenberg also struggled to address the problems with the GCL Panels. A dispute initially arose over Altenberg's failure to take possession of the panels and fees that consequently were owed for storage. *See, e.g.*, JX 593; JX 731.

Altenberg's dispute with DynaSolar broadened. Altenberg blamed DynaSolar for his decisions to purchase the GCL Panels and enter into the Beltline asset purchase agreement, and he refused to pay some of DynaSolar's invoices. Altenberg Tr. 453–59. In September 2016, DynaSolar notified Altenberg that Finance had breached the Master Consulting Services Agreement for failing to pay invoices totaling $1,125,146.83. DynaSolar terminated the agreement. JX 768 at '678. Altenberg later told Jefferson and Murphy that he had terminated the relationship. *See* JX 765 at '584. He also falsely claimed in a dispute letter to DynaSolar that he had not authorized the purchase of the GCL Panels. *See* JX 824.

The dispute with DynaSolar escalated further in December 2016 when DynaSolar placed liens on all of the projects in the Beltline Portfolio, jeopardizing the sale to Boviet. PTO ¶ 81; JX 763. Jefferson, Murphy, and Spear had several calls with Altenberg and decided that they needed to become more involved. *See* JX 763; JX 765; Jefferson Tr. 93–95. Jefferson suggested to Murphy and Spear that they insist on a "deal committee" consisting of Jefferson, Murphy, and Altenberg, who would have to approve any new deals. JX 774 at '851. Jefferson told Spear that Altenberg needed "to get on our agenda or it is over." JX 794.

43

Jefferson and Altenberg had a series of calls and emails in which Jefferson criticized Altenberg's handling of the Fund. *See* JX 798 at '024; JX 808. Jefferson brought in one of his own lawyers to deal with the DynaSolar liens, and the lawyer was able to get some of the liens removed. On December 30, 2016, Finance closed on the sale of the Beltline Portfolio to Boviet. The $2.3 million purchase price was paid into an escrow account. *See* JX 812; JX 813.

## Q.    The Parties' Relationship Fractures.

After the Boviet sale closed, Jefferson was no longer concerned about Altenberg's dispute with DynaSolar. He believed that DynaSolar only had claims against Finance, not the Fund, and he thought that the Fund held all of the rights to the various projects through special purpose entities. He thought that, if necessary, Altenberg simply could form a new entity to manage the Fund. *See* Jefferson Tr. 96, 98; JX 842. Then, on January 5, 2017, Jefferson learned that Altenberg had not placed the projects in special purpose entities owned by the Fund. Jefferson emailed Altenberg, stating, "You have a big problem. I am calling you at 8am CST." JX 855.

To address Altenburg's failure to assign the rights to the projects to the Fund, Altenberg's lawyer prepared a side letter, which provided that all "third party agreements shall be deemed to be entered into by [Finance] for the sole benefit of the [Fund] and its Members." JX 874 at '947. Jefferson signed it, but Altenberg never did. JX 873. The side letter never became effective.

On January 13, 2017, DynaSolar commenced an arbitration against Finance. *See* JX 868. On January 14, Altenberg circulated an overview of all of the Fund's projects, along

44

with his recommendations on a path forward. JX 875; *accord* JX 872. He described the consideration for the sale of the Beltline Portfolio, which consisted of (i) $2.3 million in cash that would be released from escrow as projects achieved NTP and (ii) a development fee of $0.025 per watt payable 50% at NTP and 50% at COD. Altenberg proposed to split the development fee on the projects up to 25 megawatts between Finance and the Fund. He estimated that the fee for this portion would be $625,000, so the Fund would receive about $312,500. Altenberg proposed that Finance should receive the development fee for projects beyond 25 megawatts, which he estimated would be another $250,000. *See* JX 872 at '098. Altenberg also proposed to fight the DynaSolar arbitration and to assert a counterclaim for damages. *Id.* at '098–99.

On the GCL Panels, Altenberg proposed to accept a settlement offer from GCL under which GCL would release modules valued at $1.635 million, the total amount that the Fund already had paid. The Fund then would buy the balance of the panels at a discounted price and try to resell them. This strategy would require an additional cash outlay of $564,000. *Id.* at '099–100.

On the Blue Sky projects, Altenberg estimated that construction financing could be obtained for the Colusa project with an additional cash outlay of $557,106 and for the Orland project for an additional cash outlay of $709,663. To reach these figures, he had to assume that Blue Sky would defer a portion of its fee and that a tax equity investor would contribute 25% of the total amount needed. *See id.* at '102. For the Bakersfield project with Sunrise Energy, Altenberg proposed funding it fully with an additional cash outlay of $766,329. *Id.* at '103.

To cover these amounts, Altenberg proposed using all of the proceeds from the sale of Beltline Portfolio, plus all of the profit that he assumed he could achieve by reselling the GCL Panels. That still left him with a shortfall of $340,000. Altenberg wanted the Investment Members to contribute capital to make up the shortfall. *Id.* at '103.

During a call on January 15, 2017, Jefferson and Murphy told Altenberg that he should resolve the DynaSolar arbitration and address the GCL Panels before moving forward with any projects. Altenberg insisted that they should proceed with Bakersfield and Colusa because otherwise "they [would] cancel [the] project[s]." JX 876. By this point, Jefferson and Murphy had lost confidence in Altenberg. In an email to Jefferson, Murphy doubted whether Altenberg "actually knows and can model the construction of a project in any realistic manner" and noted that Altenberg seemed "to outsource almost everything." JX 877.

During a call on January 17, 2017, Jefferson and Murphy told Altenberg that they wanted all proceeds from the sale of the Beltline Portfolio, including the development fees, to be placed in a lockbox account. They also wanted a plan for reselling the GCL Panels and an assessment of whether the Sunrise Energy projects and the Blue Sky Portfolio could be sold. JX 879; *see* JX 888. Altenberg countered that Finance should receive all of the development fees. *See* JX 885 at '957. Spear researched the GCL Panels and learned that they were three-to-five years old and would be difficult to sell. *See* JX 892; JX 894.

At this point, Jefferson had several angry interactions with Altenberg. *See* JX 878; JX 895; JX 898; JX 899. On January 26, 2017, the Investment Members sent notices under the Capital Withdrawal Provision. JX 908. The notices had little effect because the Capital

46

Withdrawal Provision only gave the Investment Members the right to withdraw "Available Cash" from projects. Until a project reached COD and was refinanced, it did not generate any Available Cash.

The parties' lawyers began sending letters and document retention notices. *See* JX 929; JX 933; JX 937. Altenberg had his lawyers complete the paperwork to transfer the rights to the Blue Sky Portfolio from Finance to the Blue Sky ProjectCo. *See* JX 947. The assignment was executed effective March 31, 2017. JX 1040. The lawyers also engaged in settlement discussions, which were unsuccessful. *See* JX 952; JX 962; JX 965.

On February 24, 2017, the Investment Members made a series of demands, including that they receive any cash held by the Fund and any proceeds received by Finance or the Fund. The Investment Members also demanded to inspect the Fund's books and records. *See* JX 974; JX 980.

On March 16, 2017, Altenberg's lawyer informed the Investment Members that the Fund would produce its books and records and intended "to make distributions to the members that have submitted Capital Withdrawal Notices in accordance with Section 4.2 of the Fund's [Operating Agreement]." JX 1024. Because there was no Available Cash to distribute in accordance Section 4.2, that was an empty promise.

Meanwhile, Spear continued trying to find buyers for the GCL Panels. *See* JX 969; JX 972. Altenberg ultimately agreed to sell them through a liquidator that Spear had found. The Fund suffered a loss of approximately $2.6 million on the sale. *See* PTO ¶ 97; Altenberg Tr. 469.

On March 1, 2017, Altenberg uploaded an investment proposal for the Colusa project to a website that he used to provide documents to the Investment Members. Jefferson and Murphy reviewed the report, which they had never seen before. It was dated June 2016, but the metadata indicated that it was created on March 1, 2017. *See* JX 987. Altenberg also uploaded a revised investment report for the Orland investment that increased the requested amount of equity funding. *Id.* The Investment Members objected to these documents, believing them to be fraudulent. *Id.* The Investment Members asked Altenberg to provide evidence that he had not backdated these reports. *See* JX 1034. Altenberg did not respond.

Altenberg previously had proposed that the Fund receive half of the development fee from Boviet for the first 25 megawatts of projects that Boviet developed. On March 7, 2017, he instructed his accountants not to credit any amount to the Fund. *See* JX 1002. Finance ended up keeping the full fee. At trial, Altenberg recalled that the amount was around $400,000. Altenberg Tr. 640. It was only at trial that Jefferson and Murphy learned that Altenberg had kept the fee. Murphy Tr. 799.

In April 2017, Finance and Sunrise Energy agreed to rescind the asset purchase agreement and return the Bakersfield project to Sunrise Energy in return for a cash payment of approximately $151,000 from Sunrise Energy to the Fund, which the Fund received on April 17, 2017. JX 1073. The Fund had invested $157,000 in project-related expenses for the Bakersfield project and had paid approximately $40,000 in legal fees for the arbitration with Sunrise. *See* Altenberg Tr. 624–26. The Fund thus lost another $46,000 on that project.

48

During the same period, the Fund received payments of $1.05 million from the escrowed sale proceeds for the Beltline Portfolio. JX 1498; *see* JX 917, JX 1038, JX 1111. The Fund did not receive the remaining $1.25 million, which was still subject to liens from DynaSolar. *See* Altenberg Tr. 475. Altenberg later agreed that DynaSolar could have the $1.25 million to settle DynaSolar's claims against Finance. As a result, the Fund lost $1.25 million on the Beltline Portfolio. Altenberg Tr. 641.

For the first three months of 2017, Altenberg charged the Fund a management fee of $94,700 per month. For the balance of the year, he charged the Fund a management fee of $86,050 per month. He charged these fees based on the nameplate megawatts that the projects identified in Finance's pipeline would generate if completed, even though most were only in the development stage and had not reached NTP. These monthly billings alone totaled $1,058,550. Taking into account other withdrawals, Finance charged the Fund $1,214,790.42 in management fees during 2017. *See* JX 1498.

## R. This Litigation

On April 17, 2017, the plaintiffs filed this action. Dkt. 1. Before filing the lawsuit, Jefferson bought Hildene's interest in HOMF at cost so that the fund would not suffer a loss or be exposed to the litigation. *See* Jefferson Tr. 139–41.

The plaintiffs moved for a status quo order to stop the Fund from taking any action outside the ordinary course of business pending the outcome of the litigation. They also asked the court to remove Altenberg as the manager of the Fund and replace him with Jefferson. The court denied the application for a status quo order, finding that damages could provide an adequate remedy. *See* Dkt. 19 at 20–29.

49

Altenberg and Finance answered the complaint. Dkt. 23. In their answer, they admitted that "Finance and Altenberg, pursuant to the Operating Agreement, were required to obtain approval from the [Fund]'s Investment Members before investing in any new project." *Id.* ¶ 36.

After Altenberg failed to comply with his discovery obligations, the court required the parties to enter into a discovery plan. *See* Dkt. 55 at 18–20. The plaintiffs learned that Altenberg was causing the Fund to advance his fees and expenses in this litigation and sought a temporary restraining order to prevent it. Relying on *Havens v. Attar*, 1997 WL 55957 (Del. Ch. Jan. 30, 1997), this court granted the motion. *See* Dkt. 81; Dkt. 90. The ruling only addressed Altenberg's ability to advance himself moneys from the Fund going forward. It did not address amounts that Altenberg had advanced to himself before this court issued its order.

The plaintiffs later sought discovery sanctions after learning that Altenberg had failed to retain evidence. The parties resolved the motion by stipulation, with Altenberg agreeing to pay $23,479.75. *See* Dkt. 92. Altenberg failed to comply with the stipulated order, and the plaintiffs moved for contempt. That motion also was resolved by stipulation. Dkt. 99. At that point, Altenberg's first set of counsel withdrew. Dkt. 105.

## S.    The DynaSolar Litigation

Meanwhile, Finance and DynaSolar were engaged in an arbitration. PTO ¶ 94. In May 2017, Finance filed a plenary action against DynaSolar in a California state court. PTO ¶ 85. That same month, Finance filed an action against DynaSolar in a Georgia federal

court, seeking to invalidate the remaining liens on the Beltline Portfolio. PTO ¶ 91; *see* JX 1086.

The litigation between DynaSolar and Finance ultimately settled. As noted, Altenberg agreed that DynaSolar could receive the $1.25 million that was still in escrow from the sale of the Beltline Portfolio and would otherwise have been returned to the Fund. *See* Jefferson Tr. 104; Altenberg Tr. 462–63, 477. In exchange, the Fund received a payment of $366,806.97 from DynaSolar's insurer. PTO ¶ 96; *see* JX 1243; JX 1258. When the money arrived, the balance in the Fund's account was negative $386.76. In a series of transactions over the next three weeks, Altenberg transferred $250,000 from the Fund to Finance. JX 1266; Altenberg Tr. 616.

In August 2017, Blue Sky gave notice that Finance had breached the asset purchase agreement by failing to pay Blue Sky for the Colusa and Orland projects, which Blue Sky represented were complete. JX 1140. Blue Sky exercised its right to take control of the projects. *Id.* Altenberg wrote a letter acknowledging Blue Sky's right to control the projects. Altenberg Tr. 585–86. Altenberg later commenced an arbitration against Blue Sky in which he sought damages of $2.1 million. Jefferson Tr. 112; *see* Altenberg Tr. 586−87.

Altenberg testified that by the end of 2017, the Fund had used up all of its capital. Altenberg Tr. 449. That was not true, as Altenberg continued to make withdrawals from the Fund's accounts during 2018. *See* JX 1498.

## T.     The Amended Complaint

On May 3, 2018, the plaintiffs filed an amended complaint. Dkt. 108. The amended complaint asserted nine causes of action against Finance, Altenberg, and his wife:

- Count I asserted a claim against Finance and Altenberg for having breached the express provisions of the Fund's Operating Agreement.

- Count II asserted a claim against Finance and Altenberg for having breached their fiduciary duties while managing the Fund.

- Count III asserted a claim against Altenberg's wife for having aided and abetted breaches of fiduciary duty by Finance and Altenberg.

- Count IV asserted a claim against Finance and Altenberg for having breached the implicit provisions of the Fund's Operating Agreement that are supplied by the implied covenant of good faith and fair dealing.

- Count V asserted a claim for fraud against Finance and Altenberg.

- Count VI asserted a claim for fraud against Finance, Altenberg, and his wife for having paid a salary to Altenberg's wife when she was not a *bona fide* employee.

- Count VII asserted a claim against Altenberg and his wife for having conspired to commit fraud by paying a salary to Altenberg's wife even though she was not a *bona fide* employee.

- Count VIII sought an accounting from Finance and Altenberg.

- Count IX asserted that to the extent Altenberg did not himself owe fiduciary duties to the Fund, then he aided and abetted Finance in breaching its fiduciary duties.

Among other relief, the plaintiffs sought "rescissory or compensatory damages to Plaintiffs, including pre- and post-judgment interest." *Id.* at 51.

Altenberg and Finance again answered the complaint. Dkt. 122. In their answer, they again admitted that "Finance and Altenberg, pursuant to the Operating Agreement, were required to obtain approval from the [Fund]'s Investment Members before investing in any new project." *Id.* ¶ 40. The parties subsequently agreed to dismiss the claims against Altenberg's wife without prejudice. Dkt. 168.

52

The plaintiffs next discovered that Altenberg had used money from the Fund to pay his legal expenses, notwithstanding this court's order. They moved for contempt. This court granted the motion, required Altenberg to repay the amounts he withdrew from the Fund with interest and ordered Altenberg to bear the costs that the plaintiffs incurred bringing the motion. Dkt. 197; Dkt. 199 at 12. The ruling did not address amounts that Altenberg had advanced to himself from the Fund before the court issued the injunction against that practice.

## U.     Dans Mountain And Energy Nexus

In April 2018, Altenberg and Finance entered into a letter of intent to acquire a project from Dans Mountain Solar for $70,000 per megawatt. The estimated size of the project was 24.20 megawatts, with 10% of the purchase price paid at signing, 40% paid at NTP, and the remaining 50% paid at the commercial operation date. *See* JX 1263.

In November 2018, VSF Devco 1, LLC ("VSF Devco") entered into a Membership Interest Purchase Agreement to purchase the Dans Mountain project. JX 1340. Altenberg represented in the agreement that VSF Devco had immediately available funds sufficient to make all of the payments called for by the agreement. At the time, VSF Devco did not have any money. Altenberg Tr. 694–95. Altenberg explained at trial that if he could not come up with the money, he planned to "just default on the contract." *Id.* at 695.

Altenberg had formed VSF Devco in August 2016 as a wholly owned subsidiary of the Fund. The Fund paid for the legal work to create the entity and draft its operating agreement. *See* JX 624; JX 1476; Altenberg Tr. 687. Altenberg testified at trial that he

purchased the Dans Mountain project for the benefit of the Fund hoping that he could use the project to settle this litigation. Altenberg Tr. 692.

In September 2018, Altenberg created a new company called Clean Energy Nexus LLC ("Energy Nexus"). PTO ¶ 13; *see* JX 1324. Altenberg owns and controls Energy Nexus. PTO ¶ 13. Its only employees are Altenberg and Daniel Gonzales, who was Altenberg's right-hand man at Finance. PTO ¶ 15.

In solicitation materials that he prepared for potential investors, Altenberg described Energy Nexus as "a relaunch of VERT Solar Finance . . . ." JX 1400 at '537. When soliciting investors for Energy Nexus, Altenberg used materials that closely resembled the materials that he used for Finance. *Compare* JX 1400, *with* JX 3. He described a similar process for developing transactions, identified the same business partners (although he omitted Open Energy), and projected similar financial returns. *See* JX 1400 at '525–29, '533.

In the solicitation deck, Altenberg identified the Dans Mountain project as one of sixteen projects in the Energy Nexus "project portfolio" (he only listed fourteen). JX 1400 at '530. Altenberg also described the Dans Mountain project elsewhere as a project being offered by Energy Nexus. JX 1340; JX 1404.

Later in 2018, Altenberg got into a dispute with the developer of the Dans Mountain project. Altenberg Tr. 696–97.

## V. Finance Declares Bankruptcy.

In April 2019, Altenberg's second set of counsel withdrew. Dkt. 222. Shortly thereafter, Altenberg's current counsel appeared. Dkt. 230.

On June 14, 2019, Finance filed for bankruptcy under Chapter 7 of the Bankruptcy Code. *See* Dkt. 257; Altenberg Tr. 449. Altenberg tried to cause the Fund to file for bankruptcy, but he did not have authority to take that step without the Investment Members' approval. *See* Op. Agr. § 5.2B(v); Jefferson Tr. 46, 60. The automatic stay went into effect, but the bankruptcy court lifted the stay to allow the plaintiffs to proceed with their claims against Altenberg. Dkt. 259.

## W.     Altenberg's Track Record

Altenberg never brought a project to NTP for the benefit of the Fund. The fourteen Awarded Projects in the Beltline Portfolio all reached NTP, but only after the execution of the master purchase agreement between Finance and Boviet. JX 1198 at 47, 73. Those projects also subsequently reached COD. *Id.* at 98; JX 1205 at 20.

Five of the Blue Sky projects reached NTP. JX 1198 at 47. In March 2017, Finance obtained construction financing for Orland and Colusa from a small regional bank. JX 1205 at 19. After Blue Sky exercised its right to reacquire the Colusa and Orland projects, they began construction, and under Blue Sky's management, both reached COD. JX 1198 at 61, 100. The Sunrise Project did not reach NTP. JX 1198 at 47.

Finance never received a loan from Open Energy. JX 1205 at 11. Altenberg submitted applications for Colusa, Orland, and Hanford, but none were accepted. *Id.* at 13–14. Altenberg claimed that the projects were too large for Open Energy to finance. *Id.* at 14.

## II.     LEGAL ANALYSIS

When addressing the legal issues in the case, the parties' post-trial briefs were less helpful than they could have been. Both sides raised numerous issues, often in an abbreviated way. The parties also engaged in simultaneous post-trial briefing, with each filing an opening post-trial brief and an answering post-trial brief. As often happens when this sequence is used, the parties did not clearly engage with each other's arguments. This decision attempts to grapple with the result.

In their post-trial briefs, the plaintiffs emphasized four claims: fraud in the inducement, fraud during the operation of the Fund, breach of fiduciary duty, and breach of contract.

The evidence at trial established that Altenberg fraudulently induced the plaintiffs to execute the Operating Agreement and invest in the Fund. The problem for the plaintiffs is that they did not advance this claim in a procedurally proper way. They did not plead a claim for fraudulent inducement in their original complaint or in their amended complaint, although that omission was not necessarily fatal. Delaware has adopted the system of notice pleading that the Federal Rules of Civil Procedure ushered in, which rejected the antiquated doctrine of the "theory of the pleadings"—*i.e.*, the requirement that a plaintiff must plead a particular legal theory. The plaintiffs thus could have taken action at some point to put Altenberg on notice that they were pursuing a claim for fraudulent inducement. But they never did. They did not outline the claim in their pretrial briefs, nor did they identify it as an issue of law in the pretrial order. They also did not make a motion during or after trial to amend the pleadings under Rule 15(b).

Although the plaintiffs' procedural misstep could have obviated the need to analyze the fraudulent inducement claim, this decision addresses it. Contrary to the conclusion reached in this decision, the plaintiffs contend that they adequately raised a claim for fraudulent inducement. The plaintiffs also point out that they did not elicit the testimony establishing the most critical of Altenberg's misrepresentations until trial. If a reviewing court were to conclude that the plaintiffs should have been allowed to present the fraudulent inducement claim, and if this court did not address it on the merits, then a remand would be necessary. At this point, the court has spent an extensive amount of time with the factual record, making it more efficient to analyze it now. In addition, the evidence that Altenberg engaged in fraud when inducing the plaintiffs to invest has affected this court's assessment of his credibility generally and the overall equities of the case. Setting forth the underlying reasons for that assessment promotes transparency.

In contrast to their claim that Altenberg made fraudulent misrepresentations when soliciting their investment, the plaintiffs failed to prove at trial that Altenberg engaged in fraud while managing the Fund. In their post-trial submissions, the plaintiffs only advanced two grounds for fraud during this time period. Neither supported a fraud claim. Part of the problem may have been the scattershot nature of the plaintiffs' briefing. As discussed below, Altenberg provided communications to the plaintiffs that appear to have been materially misleading or to have contained material omissions, but the plaintiffs did not adequately demonstrate that Altenberg committed fraud.

The plaintiffs proved that Altenberg breached the fiduciary duty of loyalty that he owed to the Fund and its members as the human controller of the Fund's managing

member. For purposes of this claim, this court has ruled on the issue of liability and provided preliminary rulings on the potential remedy. Given the state of the briefing and the record, further proceedings will be necessary to tailor a specific remedy.

This decision does not rule on the breach of contract claim. Through it, the plaintiffs sought to establish that Finance breached its obligations under the Fund's Operating Agreement, then hold Altenberg personally liable by piercing the entity veil of Finance. Because Finance is in bankruptcy, the predicate claim for breach of contract against Finance has been stayed.

## A.      Fraud In The Inducement

In their post-trial reply brief and during post-trial argument, the plaintiffs gave pride of place to their claim that Altenberg had fraudulently induced them to execute the Operating Agreement and commit to invest in the Fund. The evidence supported this claim. The problem for the plaintiffs was procedural; they never put Altenberg on notice before trial that they were pursuing a claim for fraudulent inducement, Altenberg objected at trial to the introduction of evidence relating to that claim, and the plaintiffs never sought to conform the pleadings to the evidence under Rule 15(b). The plaintiffs therefore failed to establish a procedurally proper basis for asserting the claim.

### 1.      The Elements Of Fraud

Under Delaware law, a claim of common law fraud has five elements:

1) a false representation, usually one of fact, made by the defendant[];

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). The plaintiffs proved each element.

## 2.    Knowingly False Representations

The plaintiffs proved that Altenberg made three false representations to induce them to invest in the Fund. First, he misrepresented that the Fund's first project would be Project Cali, which he would use to demonstrate that the Fund's business model worked. Second, he misrepresented that the Fund would acquire projects that could be completed within three to six months so that he could recycle the Fund's capital and generate outsized returns. Third, he misrepresented that Open Energy would be a dedicated source of financing for the Fund. Altenberg's solicitation materials contained other untruths and exaggerations, but these three undergird the plaintiffs' fraud claim.[8]

---

[8] In their post-trial answering brief, the plaintiffs argued that to induce them to invest in the Fund Altenberg also misrepresented (i) when and how Finance would charge management fees, (ii) whether Altenberg would obtain investor approval before investing in projects, (iii) whether Altenberg would use the Fund's money for investments other than solar projects, such as the acquisition of DynaSolar and the purchase of the GCL Panels, and (iv) the extent to which administrative expenses would be billed to the Fund, such as the salary for Altenberg's wife. These additional assertions raise factual issues about the extent of the misrepresentations and require weighing the strength of Altenberg's statements against competing considerations, including provisions in the Operating Agreement. This decision has discussed some of these issues for purposes of assessing Altenberg's credibility. *See infra* Part II.A.6. It is unnecessary to reach these additional issues for purposes of the claim for fraudulent inducement because Altenberg's

59

### a. Project Cali

The plaintiffs proved that Altenberg made false representations about Project Cali. Altenberg presented Project Cali as an actionable project that would be the Fund's first investment. He admitted at trial that Project Cali was not an actionable project.

In May 2015, when Altenberg solicited an investment from Jefferson and Murphy, they told Altenberg that they wanted to see if his concept worked by completing an initial project. Jefferson Tr. 31; Murphy Tr. 751. Altenberg responded by identifying "Project Cali" as the Fund's initial investment that would demonstrate proof of concept. *See* Jefferson Tr. 36, 38, 39–40; Murphy Tr. 756, 758. Altenberg represented that the project was lined up and required a prompt investment. Jefferson Tr. 40, 44; Murphy Tr. 756; *see* Altenberg Tr. 527.

Both Jefferson and Murphy testified credibly that Altenberg represented to them that Project Cali would be the Fund's first project. Jefferson Tr. 36, 39–40; Murphy Tr. 756. Murphy explained that Altenberg told Jefferson and Murphy that he needed them to "close this thing [in] less than two weeks" and "get the money quick" so that he could invest the money in Project Cali. Murphy Tr. 756–57.

Altenberg bolstered his oral representations about Project Cali by providing Jefferson and Murphy with a financial model for the project. *See* JX 4; JX 131; Jefferson

---

misrepresentations about Project Cali, the three-to-six-month time frame for projects, and Open Energy's status as a dedicated source of debt financing are sufficient to support the claim. To analyze these additional claims would excessively burden an already long opinion.

Tr. 39; Murphy Tr. 756–58. The presentation materials depicted a specific and actionable deal. Even the introductory disclaimers in the presentation depicted Project Cali as a project that (i) Finance had exclusive authority to present and (ii) was available for investment. Although the disclaimer language noted that Project Cali was owned by American Solar Utilities LLC, the same disclaimer stated that "[Finance] acting through themselves and their affiliates have been authorized to act as the exclusive agent in the direct sale of the Project." JX 4 at 2. This is significant because the plaintiffs were dealing directly with Altenberg, who was the human principal of Finance. The disclaimer further stated that the presentation was being delivered "to a limited number of parties who may be interested in a potential purchase of the Project." *Id.* The disclaimer language further recited, "This Financial Model (the 'Model') has been provided to you in relation to Project Cali . . . and relates to the offering of equity stakes in a solar PV generation plant located in California." *Id.* It added that the Model was being provided "to assist the recipient in deciding whether to proceed with a further investigation of the Project." *Id.* Although the page contained customary language disclaiming reliance on the projections in the Model and other forward-looking statements, there was nothing to suggest that Project Cali was not a real project that was available for investment. *See id.* The materials also stated that they "may not be used or relied upon for any purpose other than as specifically contemplated by a written agreement with VERT Solar Finance," but the plaintiffs are not relying on the materials themselves. They are citing the fact that Altenberg gave them the presentation to corroborate their testimony that Altenberg represented that Project Cali would be the Fund's first project.

61

In addition to the financial model, Altenberg provided Jefferson and Murphy with a term sheet from Open Energy for a loan for Project Cali. JX 1501. Although not a binding commitment, the term sheet appeared to be *bona fide*. *See id.*[9]

Still other evidence corroborates the plaintiffs' credible testimony that Altenberg represented that Project Cali would be the Fund's first project. Because of Altenberg's representations about Project Cali, the parties rushed to negotiate the Operating Agreement, which they completed in less than two weeks and signed on June 11, 2015. During those negotiations, Hildene's general counsel asked Altenberg to ensure that the Operating Agreement reflected "that no additional capital will be called from the Investment Member(s) prior to the date on which long-term financing is secured for the *initial California project*." JX 143 at '392 (emphasis added); *see* Jefferson Tr. 36. The Capital Call Provision in the Operating Agreement stated that the Investment Members "shall not be required to make any additional Capital Contributions (i) until the [Fund] has made apportionments (and distributions, if applicable) of Available Cash attributed to the long-term financing of the [Fund]'s *initial Project* . . . ." Op. Agr. § 3.2B (emphasis added). In

---

[9] At trial, while cross examining Murphy, Altenberg's counsel pointed to features of the term sheet that were more consistent with long-term financing at COD, rather than construction financing at NTP. Murphy candidly acknowledged that fact, and it appeared to be the first time he had realized it. *See* Murphy Tr. 822–26; Dkt. 294 at 84 (Altenberg's counsel noting during post-trial argument that he thought Murphy "was a little embarrassed by that"). Murphy's testimony and demeanor suggests that he was misled by the term sheet when Altenberg first provided it and did not perceive those details until they were pointed out at trial.

other words, the Investment Members would not have to put in any more money until the initial California project—Project Cali—reached COD.

After the parties began negotiating the Operating Agreement, Altenberg contacted a minority investor in Finance to report his anticipated deal with Jefferson and Murphy. JX 177. When describing the terms of the investment, Altenberg explained that the investors had a "[o]ne time withdraw [right] at COD of First Project (i.e. *Project Cali*) and then locked through December 31, 2016 . . . ." JX 177 at '355 (emphasis added).

On June 11, 2015, the parties executed the Operating Agreement, and Jefferson and Murphy each wired $500,000 to Altenberg. *See* JX 1496. That was the exact amount of equity called for in the Project Cali presentation. JX 4 at 5. One month later, in July 2015, Altenberg told Jefferson that Project Cali was on hold. Murphy promptly emailed Altenberg and asked about "the progress on the California City investment." JX 1502. Murphy noted that "it was the first and principal investment we funded," and he asked Altenberg to give him updates on its "status from time to time[,] particularly significant changes when known." *Id.*

At trial, Altenberg's testimony established that his representations about Project Cali were false. He testified that Project Cali was not a real project, but only an "illustration of how a project might work." Altenberg Tr. 729. He claimed it was intended to show "what the economics could be." Altenberg Tr. 524. He further testified that "the California City project [was] not really a project that was being offered to the Investment Members." Altenberg Tr. 524. He added that for purposes of soliciting Jefferson and Murphy, the "project [did] not exist." Altenberg Tr. 531.

### b. The Three-To-Six-Month Project Timeline

The plaintiffs proved that Altenberg made false representations about his ability to complete projects in three to six months, which was critical to his ability to recycle the Fund's equity and generate outsized returns. The evidence established that Altenberg had no ability to achieve this timeline and to recycle the Fund's capital to the extent that he claimed.

Altenberg represented that he could roll over each investment in three to six months. His solicitation materials stated that the "Timing per Project" would be "3 to 6 months from project selection to commercial operation." JX 3 at '079; JX 126 at '119; *see* Jefferson Tr. 23–24; Murphy Tr. 753. Altenberg's representations about the timeline were critical to his claim that he could generate outsized returns. Altenberg's solicitation materials represented that "[w]e will reinvest the equity from each project into the next project thereby revolving the equity as we complete construction and refinancing at commercial operations." JX 3 at '078; JX 126 at '118; *see* JX 1499. Altenberg thus claimed that he could recycle the equity component at least twice (and as many as four times) per year. Jefferson Tr. 30–31; *see* JX 3 at '078; JX 126 at '118.

At trial, Altenberg admitted that projects could not be completed in three to six months. Altenberg Tr. 352–53. He testified that he had never seen a solar project take three to six months from project selection to COD. Altenberg Tr. 520. He instead testified that it takes "about 12 to 18 months." Altenberg Tr. 321–22; *accord* Altenberg Tr. 353. At another point, he testified that a project might as little as five months and as much as thirteen months. Altenberg Tr. 737. To justify his representation that projects could be completed

64

in three to six months, Altenberg claimed that he was referring to a project that was already at NTP. Altenberg Tr. 351, 724–25. His solicitation materials did not say that. Altenberg represented in unqualified terms that projects would take three to six months to complete.

In any event, Altenberg did not purchase late-stage projects that had already reached NTP and potentially could be completed within three to six months after acquisition. Altenberg purchased portfolios of early-stage projects that were a long way from NTP. In November 2015, Finance purchased the Blue Sky Portfolio. All of its projects were early-stage projects; none had reached NTP. JX 226; JX 230. By September 2016, almost a year later, not one project had been completed. JX 662. Altenberg initially prioritized five of the Blue Sky projects. By September 2016, three were still in the permitting phase, meaning that they had not yet reached NTP. *See id.* The other two had received building permits, but physical construction on the projects had not begun. *See id.*

The same was true for the Sunrise Energy projects, which Finance acquired in February 2016. JX 330. The Sunrise Energy portfolio consisted of one meaningful project (Bakersfield), one project that Altenberg listed on his weekly updates but that never moved beyond due diligence (Licking Creek, Pennsylvania), and other nascent projects in Pennsylvania. All of these projects were early-stage projects. By September 2016, physical construction on the Bakersfield project had not started. JX 662. By the January 2017 update, Altenberg had dropped the Licking Creek project, and the Bakersfield project was still in "Construction Prep." JX 856.

### c. Dedicated Financing From Open Energy

The plaintiffs proved that Altenberg made false representations about his ability to secure financing through Open Energy. Altenberg presented Open Energy as a dedicated source of financing and told the investors that obtaining financing for the Fund's projects was "lock." In reality, Open Energy did not have the capacity to finance the Fund's projects.

In the solicitation materials that Altenberg sent to Jefferson and Murphy, Altenberg represented that Finance had ready access to debt financing through its relationship with Open Energy. On a slide titled "VERT Solution," under a heading titled "Dedicated Sources of Capital," the solicitation materials listed "Debt Financing (Open Energy Group)" with a checkmark beside it, indicating that this component was secured. JX 3 at '075; JX 126 at '115. Three pages later, on a slide titled "Dedicated Capital," under a heading titled "Debt," Altenberg again identified Open Energy. JX 3 at '078; JX 126 at '118. The solicitation materials noted that Altenberg, the "founder" of Finance, was "also a co-founder" of Open Energy. JX 3 at '078; JX 126 at '118.

At trial, both Jefferson and Murphy testified that Altenberg, had described debt financing from Open Energy Group as a "lock," which they understood to mean that it effectively was guaranteed. *See* Jefferson Tr. 20, 27, 109; Murphy Tr. 759–60. Altenberg underscored and reinforced his representations about Open Energy by providing Jefferson and Murphy with a term sheet from Open Energy for financing on Project Cali. JX 1501.

The evidence at trial established that Altenberg's representations about Open Energy were false. At trial, Altenberg testified that Open Energy's financial resources

66

consisted of a $1 million investment that it received in 2015 from a "group out of London." Altenberg Tr. 333. Open Energy had no other sources of capital. *Id.* For projects, Open Energy solicited investors using a crowd-funding model. *Id.* at 334. If investors did not want to invest, then Open Energy could not provide financing.

The parties stipulated that Altenberg submitted multiple loan requests on behalf of the Fund to Open Energy, but "[t]he requested loans were never provided by [Open Energy] and no financing was ever obtained." PTO ¶ 157. They further stipulated that "[Open Energy] recognized that the proposed projects from Altenberg would never be completed and were bad deals." PTO ¶ 55. The parties stipulated that "Finance has never entered into a loan agreement with Open Energy Group or any of its affiliates or subsidiaries." PTO ¶ 126. Jefferson testified to the same effect. Jefferson Tr. 79–80, 107–08.

Altenberg depicted Open Energy as more than it was. It was not a dedicated source of financing, and it could not provide debt financing for the Fund's projects.

### 3. Altenberg's Intent To Induce Reliance

The plaintiffs proved that Altenberg intended for the plaintiffs to rely on his false representations. He sent his solicitation materials, a "pitch deck," to the plaintiffs for the admitted purpose of seeking an investment in Finance. Altenberg Tr. 510. He expected the plaintiffs to rely on the representations in his solicitation materials. *Id.* The misrepresentations about the three-to-six-month timeline and about Open Energy appeared in the solicitation materials. *See* JX 3; JX 121; JX 126.

Altenberg's subsequent behavior also shows that he intended to induce the plaintiffs to invest based on these representations. He made a similar representation about the

67

timeline for project completion in September 2015, when he was worried that the plaintiffs would want their money back after telling them that Project Cali had fallen through. This time, Altenberg told Jefferson and Murphy that "[Finance] will use a majority of the proceeds from [the Investment Members] in VERT Solar Fund I to acquire late stage projects . . . to be operational within 3-6 months." JX 202. That was false. Altenberg was looking at portfolios of early-stage projects, and two months later, Finance acquired the Blue Sky Portfolio. It only contained early-stage projects.

Altenberg made similar representations during a meeting in Houston on June 15, 2016. Murphy's cousin attended the Houston meeting, and Altenberg regarded him as a potential investor. Altenberg distributed a presentation that included many of the same slides that he had used when soliciting an investment from Jefferson and Murphy. *See* JX 19. Altenberg represented that the equity investment would be a short-term investment and stressed that "[t]he key is equity recycling." JX 543 at '698. Consistent with his representation to Jefferson and Murphy that projects could be completed in three-to-six months, Altenberg listed a pipeline of 111.10 megawatts of projects and represented that "[a]ll projects can begin construction within the next 3 months or are already proceeding." JX 19 at 12. At the time, Altenberg did not have any projects in the construction phase. Altenberg again claimed that Finance had a durable relationship with Open Energy, and he represented that Open Energy provided both the construction financing and long-term debt for Finance's projects. JX 543 at '698. Elaborating, he claimed that Finance was "one of [Open Energy's] pipelines" and that "[t]he majority of loans they do each month is VERTs." *Id.*

Altenberg also intended for the plaintiffs to rely on his representations about Project Cali. Altenberg introduced Project Cali into the discussions after Jefferson and Murphy said that they wanted to invest in a single project to test whether Altenberg's business model would work. Knowing that he needed to present Jefferson with an actionable project to secure his investment, Altenberg served up Project Cali. When he presented it, he told the plaintiffs that they would "need[] to get the money quick because he was concerned he could lose the project." Murphy Tr. 757.

### 4. The Plaintiffs Reasonably Relied On Altenberg's Representation

Jefferson and Murphy reasonably relied on Altenberg's misrepresentations when they executed the Operating Agreement on June 11, 2015, committed to provide $2.5 million in capital, and wired an initial $1 million to the Fund. As Altenberg intended, his representations about Project Cali catalyzed the investment. The term sheet for Project Cali was dated May 26, 2015. JX 1501. Altenberg sent a copy of the Project Cali presentation to Jefferson on May 30, 2015. JX 131. After a conversation with Altenberg, Murphy understood that the investment in Project Cali could "close . . . [in] less than two weeks." Murphy Tr. 756. Immediately after these exchanges, the parties started negotiating the Operating Agreement. On June 11, 2015, after less than two weeks of negotiations, they signed the Operating Agreement. PTO ¶ 22. The $1 million that Jefferson and Murphy wired to the Fund was the precise amount that Altenberg said he needed for Project Cali.

The plaintiffs also reasonably relied on Altenberg's representations about the three-to-six-month timeframe for completing projects. Altenberg touted his experience in the energy industry, and it was reasonable for the plaintiffs to rely on his representations about

69

how long it would take for him to complete the projects that he selected. It is true that the Operating Agreement provided for a management fee of $170,000 per megawatt based on the parties' discussions that a project could take as long as seventeen months. That provision, however, was not inconsistent with Altenberg's representation that the Fund would select projects that could be completed in three to six months, because the seventeen months was an outer boundary for how long a project would take. Altenberg represented that he would select projects that could be completed in three to six months so that he could recycle the Fund's equity and generate outsized returns.

The plaintiffs also reasonably relied on Altenberg's representations about his ability to obtain funding from Open Energy. Altenberg was a co-founder and the Chief Financial Officer of Open Energy, so it was reasonable for the plaintiffs to believe that Altenberg knew whether Open Energy would underwrite the types of projects that he planned to select for the Fund. Altenberg also provided the Investment Members with a detailed term sheet for a loan from Open Energy for Project Cali, which Altenberg represented would be the Fund's first venture. *See* Jefferson Tr. 108–09, 296. Based on the term sheet, which appeared to be actionable, it was reasonable for the plaintiffs to conclude that Open Energy was more than a hypothetical source of debt financing for the Fund.

Jefferson reasonably relied on the same misrepresentations when he caused HOMF to execute the Operating Agreement and commit to invest in the Fund. Jefferson approved the concept of HOMF investing in December 2015, and the formal documents were executed in March 2016. At neither point had Jefferson learned enough to suspect that Altenberg's representations were false. Altenberg told Jefferson and Murphy that Project

70

Cali had fallen through. It was not until trial that the plaintiffs learned that Project Cali never was available as a project in the first place. Jefferson also did not yet have reason to doubt Altenberg's representation about bringing projects to completion within three to six months. Altenberg acquired the Blue Sky Portfolio in early November 2015 and told Jefferson and Murphy that he was starting work on Placerville, Orland, and Hanford on November 16, 2015. By December 2015, only one month had passed, and by March 2016, only four months had passed. Nor did Jefferson know that Open Energy was not a dedicated source of funding. The plaintiffs did not uncover that fact until 2017, after their relationship with Altenberg had broken down. HOMF invested in the Fund in March 2016 based on the same false representations that Jefferson and Murphy relied on when investing in June 2015.

### 5. Damages

The plaintiffs proved that they suffered damages as a result of relying on Altenberg's false representations. Having executed the Operating Agreement, the plaintiffs were contractually bound to fulfill their capital commitments. Between June 2015 and December 2016, the plaintiffs invested a total of $6,829,500. They lost it all.

### 6. Other Evidence Regarding Altenberg's Credibility

The core misrepresentations about Project Cali, the three-to-six-month timeline for project completion and equity recycling, and the availability of dedicated financing from Open Energy were not the only examples of Altenberg's misstatements. There is ample evidence in the record of other misrepresentations; this evidence undercuts Altenberg's overall credibility.

71

First, in addition to the principal misrepresentations on which plaintiffs rely, Altenberg's solicitation materials contained other misrepresentations. The solicitation materials represented that Finance was "a leading tax equity expert" with "extensive relationships with tax equity investors." JX 3 at '078; JX 126 at '118. On a slide titled "Established Relationships Across the Industry," the solicitation materials represented that Finance had "pre-existing relationships with leading industry players," and identified the following companies as "Tax Equity Providers": Google, JP Morgan, US Bank, MetLife, and Bank of America. JX 3 at '077; JX 126 at '117. Altenberg stipulated that Finance had never received tax equity financing from Google, JP Morgan, US Bank, MetLife, or Bank of America. PTO ¶¶ 133–37. His materials also represented that Finance "will have a dedicated tax equity fund to support the capitalization of each projects [*sic*] on a fixed term and structured basis." JX 3 at '078; JX 126 at '118. Finance did not have and never created a dedicated tax equity fund.

In addition to misrepresenting the nature of his relationship with Open Energy, Altenberg's solicitation materials also misrepresented his relationships with other providers of debt financing. On the slide titled "Established Relationships Across the Industry" Finance identified its "pre-existing relationships with leading industry players." JX 3 at '077; JX 126 at '117. The solicitation materials identified the following companies as "Lenders" in addition to Open Energy: CoBank, Morgan Stanley, US Bank, and Bank of America. Altenberg stipulated that Finance had never entered into a loan agreement with Open Energy, CoBank, Morgan Stanley, Bank of America, US Bank, or any of their affiliates or subsidiaries. PTO ¶¶ 126–27, 129–31. Altenberg only loose ties with the other

72

two lenders. Through VERT Investment Group, Altenberg had entered into a loan agreement with CoBank for a wind project in 2010. PTO ¶ 128. And VERT Investment Group once had obtained a loan from US Bank. PTO ¶ 132.

Second, Altenberg misrepresented significant aspects of his plans for the Fund. When soliciting an investment from Jefferson and Murphy and when negotiating the Operating Agreement, Altenberg agreed that the Fund would pursue an initial project and complete it before acquiring other projects. The Operating Agreement reflected this point in the Capital Call Provision, which relieved Jefferson and Murphy of their obligation to fund any project until the first project was complete. At trial, Altenberg testified that he never intended to pursue a single project but only portfolios of projects. Altenberg Tr. 353, 355–56. He also claimed that it was not possible to buy individual projects. *Id.* 355–56, 536. Although the plaintiffs never invoked this aspect of the Capital Call Provision,[10] Altenberg's deviation from the parties' understanding of their business deal nevertheless shows how he approached his discussions with the plaintiffs.

Along similar lines, Altenberg misrepresented how the Fund would use project companies. When soliciting an investment from Jefferson and Murphy, Altenberg represented that each project would be placed in a separate project company and owned by the Fund from the point of project acquisition. *See* JX 136; JX 1495; *see also* JX 538;

---

[10] After Altenberg claimed that Project Cali had fallen through, Murphy wanted his money back, but Altenberg convinced him to support the first three projects in the Blue Sky Portfolio.

Altenberg Tr. 664. The Operating Agreement reflected this point in the Project Company Requirement. At trial, Altenberg testified that he planned to use an entirely different structure in which Finance would acquire and own the project until COD, and then would sell the project to a project company owned by the Fund at COD so that the Fund could receive a step-up in basis. *See* Altenberg Tr. 358–59, 387–88, 523, 532–33. That approach might well have been effective for minimizing taxes and enhancing returns, but it was fundamentally contrary to how Altenberg represented that the Fund would operate.

Altenberg also misled Jefferson and Murphy about the flow of funds and the source of development fees that would be paid to Finance. Altenberg provided Jefferson and Murphy with an illustration showing the flow of funds to and from the Fund, which only depicted Finance receiving fees from the project companies. JX 136; JX 1495. Altenberg prepared a similar document in September 2015, titled "VERT Solar Finance Company – Project Acquisition & Finance Summary," which likewise showed Finance receiving its fees from the project company when the project was refinanced after COD. JX 538. Jefferson and Murphy understood that any fees to Finance would be paid at COD. Murphy Tr. 767, 771. Section 2.9 of the Operating Agreement implemented a different structure in which Finance could take a fee directly from the Fund and did not have to wait until COD. The parties certainly could agree to a different fee structure, but this is another example of a bait-and-switch by Altenberg.

Third, Altenberg's communications during the life of the Fund were not a model of candor. During 2016 and for much of 2017, Altenberg provided weekly updates to Jefferson and Murphy. Having reviewed all of the weekly updates, I agree with the

74

plaintiffs that they were jargon-filled, complex, and difficult to follow. They seemed to describe everything Finance was doing, without focusing on matters relevant to the Fund. They contained heavy applications of positive spin, and they often seemed to provide only part of the story. One example is the purchase of the GCL Panels. Altenberg referred on several occasions to the potential purchase of modules, but he did not disclose the full terms of that purchase until after the agreement was signed. *See* Spear Tr. 908; JX 443. Altenberg similarly did not disclose the cost of the Beltline Portfolio until after the deal was signed. *See* Jefferson Tr. 84–85.

Fourth, Altenberg provided misleading monthly reports of net asset value ("NAV"). When HOMF invested in the Fund, HOMF entered into a side letter with Finance to provide monthly NAV reports, which HOMF needed because it was part of the Hildene fund complex. *See* JX 398. HOMF wanted the NAV report to reflect the fair market value of the Fund's assets, and Altenberg represented that Finance hired "Duff & Phelps to provide mark to market analysis and process review." JX 319; *see* Jefferson Tr. 77–78 (explaining why HOMF needed to mark to market). Altenberg also hired an accounting firm, ThayerONeal, to compile the reports. Altenberg Tr. 428–29.

The NAV reports consistently presented the net asset value of the Fund based on the amount of cash that Finance had withdrawn from the Fund for each project. As a result, the NAV reports reflected essentially stable values, even as the projects failed to achieve key milestones and became impaired. *See* JX 1497; Jefferson Tr. 122; *see also* Altenberg Tr. 594–96. The NAV reports also consistently reported the net asset value of the Fund as if the Fund owned the projects, when Finance in fact owned the projects. And even though

the NAV reports effectively consolidated the assets of Finance and the Fund by presenting the projects as if they were owned by the Fund, the NAV reports did not present or otherwise take into account any of the contractual liabilities associated with the projects, ostensibly because they were obligations of Finance and not the Fund. The NAV reports thus presented a misleading picture of assets without related liabilities. Jefferson Tr. 122–23. For example, the NAV Report never disclosed Finance's liabilities to DynaSolar. Altenberg Tr. 585. The NAV Report also never identified the liability for the GCL Panels. Altenberg Tr. 657, 703. As a result, the NAV Reports were misleading and did not provide the Investment Members with meaningful insight into the value of the Fund.

Finally, Altenberg lied about little things. For example, in November 2015, he represented that Don Kendall had joined the board of Finance as executive chair, but that never happened. Altenberg Tr. 572. He also lied about Elwin Thompson and Erica Engle working for Energy Nexus, when they did not. *See* Altenberg Tr. 707−09. *Compare* JX 1400 at '515, '537, *with* PTO ¶¶ 16–17. And during a deposition taken by the trustee in bankruptcy, Altenberg testified that Finance had no employees in 2018 even though both Altenberg and Daniel Gonzalez were employees of Finance in 2018. Altenberg Tr. 498; Gonzales Tr. 928. When confronted with the inconsistency, Altenberg retreated to a distinction between employees who receive a W-2 and contractors who receive a Form 1099, claiming that he and Gonzales did not receive W-2s. Altenberg Tr. 501–02. Gonzales testified that in 2018, he received a W-2 and did not receive a Form 1099. Gonzales Tr. 928.

The record contains over 1,500 exhibits and many pages of testimony. Having reviewed it in detail, and having evaluated Altenberg's demeanor at trial, I have concluded that Altenberg was not a credible witness, nor was he a candid business partner.

### 7. The Merits-Related Defenses

Altenberg raised three defenses that addressed the merits of the plaintiffs' fraud-in-the-inducement claim. None would bar the plaintiffs from a recovery.

First, Altenberg relies on Section 9.10 of the Operating Agreement, claiming it forecloses the plaintiffs' fraud claim. *See* Dkt. 287 at 20. Titled "Entire Agreement," this section states, "This Agreement constitutes the entire agreement among the parties. This Agreement supersedes any prior agreement or understanding among the parties and may not be modified or amended in any manner other than as set forth herein or therein." Op. Agr. § 9.10. This provision is a standard integration clause, not an anti-reliance provision. It does not bar reliance on extra-contractual representations, and it does not foreclose a claim of fraud based on extra-contractual representations. *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006).

Second, Altenberg points out that the plaintiffs did not bargain for a provision in the Operating Agreement that would require Open Energy to provide financing. Dkt. 279 at 49–50; Dkt. 287 at 20, 30. That is true, but it is beside the point. A fraud claim can be based on extra-contractual representations, and a fraud claim does not depend on the absence of a contractual commitment to the same effect.

Third, Altenberg argues that he cannot be liable for fraud based on the representations in his solicitation materials because those materials solicited an investment

77

in Finance, yet the plaintiffs ended up making an investment in the Fund. There was a direct and unimpeded path from Altenberg's solicitation of the investment in Finance to the plaintiffs' investment in the Fund. The change in structure was part of Altenberg's solicitation and was designed to address Jefferson's discomfort with investing directly in Finance. The factual premises for the plaintiffs' investment remained the same, namely that Altenberg had everything he needed for a successful business except equity financing, that the first project would be Project Cali, that Altenberg could generate outsized profits for the equity investors by recycling their equity every three to six months, and that Open Energy was a dedicated source of financing. Those representations were false. The change in the structure of the investment does not insulate Altenberg from liability for fraud.

### 8. The Pleading-Stage Defense

In his post-trial briefs and during post-trial argument, Altenberg maintained that by pursuing a claim for fraudulent inducement, the plaintiffs were attempting to prove a cause of action that was not pled in the complaint. *See* Dkt. 287 at 2–3, 15–17; Dkt. 294 at 72–74. The plaintiffs responded that they had pled fraudulent inducement. Dkt. 285 at 39.

Neither the original complaint nor the amended complaint contained a count titled "Fraudulent Inducement." That omission, however, is not dispositive. The notion that a complaint must plead the legal theories on which the plaintiff intends to proceed is a throwback to the "theory of the pleadings." *See* 5 Charles Allen Wright et al., *Federal Practice and Procedure* § 1219 (3d ed. 2004 & Supp. 2020) [hereinafter, "Wright & Miller"]. Under this doctrine, which was a feature of pleading at common law and of code pleading in some jurisdictions, a complaint had to "proceed upon some definite theory, and

78

on that theory the plaintiff must succeed, or not succeed at all." *Mescall v. Tully*, 91 Ind. 96, 99 (1883). Put differently, a plaintiff had to pick a legal theory at the outset of the case and stick with it. *See generally* Fleming James, Jr., *The Objective and Function of the Complaint: Common Law—Codes—Federal Rules*, 14 Vand. L. Rev. 899, 910–11 (1961). If the facts did not support the theory that the plaintiff had picked, then the court would not grant relief, even if the facts established an entitlement to relief until a different theory. *See id.*

Through a combination of rules, the Federal Rules of Civil Procedure "effectively abolish[ed] the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." 5 Wright & Miller, *supra*, § 1219 (footnote omitted).

> Rule 8(a) eliminates the concept of "cause of action"; Rule 8(d) provides that a party may set forth two or more statements of claim alternatively or hypothetically; Rule 15(b) deals a heavy blow to the doctrine by permitting amendments as late as the trial and treating issues as if they had been raised in the pleadings when they are tried by the express or implied consent of the parties; and Rule 54(c) provides that, except in the case of a default judgment, the "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

*Id.* (footnotes omitted). Under the Federal Rules of Civil Procedure, "particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not." *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir. 1945) (Clark, J.). "The federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided

79

always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits." 5 Wright & Miller, *supra*, § 1219 (footnotes omitted). *See generally Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (reversing dismissal of complaint for failure to articulate a claim under 42 U.S.C. § 1983; explaining that the Federal Rules of Civil Procedure rejected the "theory of the pleadings" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

The Delaware courts embraced the new direction charted by the Federal Rules of Civil Procedure. "In 1948, the Courts of Delaware shook off the shackles of mediaeval scholasticism and adopted Rules governing civil procedure modeled upon the Federal Rules of Civil Procedure." Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 327 (1956) (internal quotation marks omitted). When commenting on the new rules, Judge Herrmann pointed out that "[t]he de-emphasis upon pleadings and the re-emphasis upon ascertainment of truth is reflected in . . . the almost automatic amendment of pleadings. Under Rule 15(b), for example, if issues not raised by the pleadings are tried without objection, they are treated as though raised in the pleadings . . . ." *Id.* at 338.

The real question, therefore, is not whether the amended complaint contained a count called "Fraudulent Inducement," nor whether it contained allegations that formally tracked the elements of that theory. Rather, the question is whether the amended complaint contained a short, plain statement of facts sufficient to put Altenberg on notice that the plaintiffs were litigating a claim for fraudulent inducement, along with allegations sufficient to make it reasonably conceivable that the plaintiffs could be entitled to recover.

80

*See* Ct. Ch. R. 8(a); *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). To argue that the amended complaint satisfied this standard, the plaintiffs cite paragraph 138 of the operative complaint, which alleges, "Altenberg intended to induce Plaintiffs from acting to protect their investment or take other legal action against [him], hoping to finalize the transactions and turn a profit before their conduct was discovered." Compl. ¶ 138. Although that allegation uses the verb "induce," it does not suggest Altenberg committed fraud when soliciting the plaintiffs' investment and convincing them to execute the Operating Agreement and invest. It rather suggests that Altenberg took action while the Fund was in existence to keep the plaintiffs from identifying misconduct and acting to protect their investment.

A review of the amended complaint as a whole confirms that the plaintiffs focused on how Altenberg operated the Fund, not the solicitation of the plaintiffs' investment. To the extent that the amended complaint addressed statements made before the execution of the Operating Agreement, it described the business negotiations between the parties to show that Altenberg subsequently operated the Fund in a manner inconsistent with the agreements reached during the negotiations. The amended complaint did not discuss Altenberg's solicitation materials.

Even still, the failure of the amended complaint to address Altenberg's solicitation of the plaintiffs' investment would not have foreclosed the plaintiffs from conducting discovery into these issues or seeking to prove a fraudulent inducement clam at trial, if the plaintiffs had given Altenberg fair notice that they intended to do so. The Federal Rules contemplate that the parties will identify and frame the issues for decision through

81

discovery, motions for summary judgment, and "the use of pretrial conferences and pretrial orders under Rule 16." 5 Wright & Miller, *supra*, § 1219.

It is clear that the parties conducted extensive discovery into the early phases of the parties' relationship, starting with the first time that Jefferson and Altenberg spoke about possible solar projects in the Virgin Islands. It also is clear that they thoroughly investigated the solicitation of the plaintiffs' investment. But the plaintiffs have not pointed to anything that put Altenberg on notice that he would face a claim for fraudulent inducement at trial.

The plaintiffs' pre-trial brief did not identify fraudulent inducement as an issue for trial. *See* Dkt. 253. At most, the brief contained isolated snippets here and there. The introduction included a cursory reference to the solicitation period, stating, "Although Altenberg presented himself to Plaintiffs as an expert in the solar industry, he was only just learning." *Id.* at 1. On the same page, in a footnote, the brief stated: "It was only because Altenberg lied to Jefferson that getting financing from [Open Energy] was not a problem that Jefferson engaged with Altenberg." *Id.* at 1 n.1. In the statement of facts, the entirety of the discussion of the solicitation phase consisted of the following paragraph:

> In 2015, Altenberg approached Jefferson with an opportunity to invest in Finance, Altenberg's company serving the solar energy sector. The plan was for Finance to provide equity investments to new solar energy projects. Altenberg would then obtain construction financing from [Open Energy]. This financing was crucial to launching each project. Altenberg represented he was certain to obtain financing from [Open Energy] because of his extensive knowledge of [Open Energy]'s business and requirements and his being the company's CEO. Jefferson was interested in Altenberg's concept particularly because Altenberg's relationship with [Open Energy] promised a secure source of financing. But for Altenberg's misrepresentations regarding his relationship with [Open Energy], Jefferson would not have invested with Altenberg.

82

*Id.* at 8–9. The statement of facts thus mentioned that Altenberg had misrepresented his ability to obtain financing from Open Energy, but it did not examine the solicitation materials in any detail and did not discuss the three-to-six-month timeline. To the extent that the brief further discussed the time period before the execution of the Operating Agreement, it compared and contrasted how Altenberg represented that he would operate the Fund with how he actually operated the Fund. *See id.* at 9–10.

In its legal analysis, the plaintiffs' pre-trial brief did not provide any meaningful discussion of a claim for fraudulent inducement. In its "Statement of the Questions Involved," the brief asked, "Did Defendants defraud Plaintiffs?"—to which it answered "Yes." *Id.* at 33. But when describing the claim for fraud, the brief focused on Altenberg's conduct while operating the Fund. The entire presentation of the claim consisted of the following two paragraphs:

> Altenberg repeatedly misled, concealed, or flat out lied to Plaintiffs about the status of the Fund and its projects. *Altenberg induced Plaintiffs to invest in the Fund by lying about his experience in the solar finance industry and his knowledge of [Open Energy]'s requirements.* He continued to lie to Plaintiffs throughout the life of the Fund so that he could use Plaintiffs' capital to build his reputation, contacts, and experience in the solar finance industry. Altenberg issued misleading and false financial statements to Plaintiffs to facilitate his continued fraud against them. When he drained the Fund of all of its capital, Altenberg put Finance in bankruptcy and transferred all its assets to [Energy Nexus]. Altenberg now enjoys the benefit of Plaintiffs' investment by running his lucrative new company.

> Altenberg had a duty to provide information to, or at a minimum not mislead, Plaintiffs. Altenberg breached this duty at every turn. Now that Altenberg's misconduct has been uncovered, Plaintiffs are entitled to an order finding that Altenberg is a fraud.

*Id.* at 35–36 (emphasis added). Only the highlighted sentence referred to the solicitation phase, and it did not address Altenberg's solicitation materials in any detail or mention the three-to-six-month timeline. It referenced Open Energy, but it discussed Altenberg's knowledge of Open Energy's requirements, not its status as a dedicated source of financing.

The plaintiffs could have put Altenberg squarely on notice of a fraudulent inducement claim by identifying the issue in the pre-trial order. Yet the plaintiffs' description of the nature of the action read as follows:

This action arises from Plaintiffs' claims that:

(A) Defendant violated the terms of the Fund's Operating Agreement and breached his fiduciary duties owed to Plaintiffs and the Fund by, among other things:

(i) failing to obtain Plaintiffs' approval prior to entering into certain transactions;

(ii) taking fees from the Fund without any basis or approval;

(iii) using the Fund to pay for costs and fees that were not authorized or proper;

(iv) engaging in *ultra vires* transactions using the name and/or assets of the Fund;

(v) misrepresenting the Fund's financials to Plaintiffs;

(vi) committing the Fund to new projects before completing existing projects of the Fund;

(vii) failing to enter into transactions in the name of the Fund;

(viii) failing to assign to the Fund interests in transactions not entered into in the name of the Fund;

(ix) failing to form special purpose entities to effectuate projects; and

(x) improperly advancing themselves litigation expenses to pay for the defense of the instant litigation; and

(B) Defendant committed fraud and conspired to commit fraud by keeping Plaintiffs in the dark about the unauthorized investment into certain transactions and fees taken from the Fund and by making false and misleading statements to further the fraud, including about the Fund's financials.

PTO ¶ I.A (formatting added). The plaintiffs thus described a case that would examine the period after the execution of the Operating Agreement, not the solicitation of the plaintiffs' investment.

The plaintiffs' statement of the issues of fact and law that remained to be litigated also did not focus meaningfully on the solicitation period. *See* PTO ¶ III.A. The plaintiffs identified seventy-two issues to be resolved, but only the following four paragraphs bore any relationship to the solicitation of their investment:

18. Prior to forming the Fund, Altenberg pitched Finance to Jefferson seeking an investment into Finance.

19. Jefferson declined to invest in Finance expressing a preference to form a fund.

20. Specifically, the purpose of the Fund was to pool capital of the Investment Members to invest in renewable energy development projects, which were to be selected by the Fund's managing member and approved by the Fund's Investment Members for investment by the Fund.

21. Plaintiffs are the sole investors in the Fund.

*Id.* The plaintiffs did not state that the court needed to resolve whether Altenberg fraudulently induced the plaintiffs to sign the Operating Agreement and invest in the Fund.

During trial, the plaintiffs' counsel elicited testimony from Jefferson about Altenberg's solicitation materials and misrepresentations. Altenberg's counsel objected to

85

the testimony, arguing that there was no claim for fraudulent inducement in the case and that any parole evidence about the terms of the investment was barred because the language of the Operating Agreement was plain and unambiguous. *See* Tr. 21, 37. Plaintiffs' counsel disagreed and asserted that there was a viable fraud claim in the case. Tr. 21. The parties agreed to defer the issue until post-trial briefing. *Id.*

After Altenberg's counsel raised this objection, both sides introduced evidence about the solicitation of the plaintiffs' investment and the pre-contracting period. The first 180 exhibits dealt with this time period. Both lawyers elicited extensive testimony from Jefferson, Murphy, and Altenberg about the representations that Altenberg made to the plaintiffs. During trial, Altenberg gave the critical testimony on which the plaintiffs subsequently relied as the centerpiece of their fraudulent inducement claim: his testimony that Project Cali had never been a project that was available to the Fund.

During post-trial briefing, the plaintiffs emphasized the fraudulent representations that Altenberg made when soliciting their investment. In their opening post-trial brief, when describing the facts that had been established at trial, the plaintiffs fully outlined the basis for a fraudulent inducement claim. *See* Dkt. 278 at 7–11. In their legal analysis, however, fraudulent inducement remained a secondary concept, receiving only a page, plus two lines, of discussion. Even that brief discussion focused heavily on Altenberg's description of how the Fund would operate. The false statements in the solicitation materials received only the following three sentences of attention:

> Altenberg's false pitch documents fraudulently misrepresented that Project Cali was ready for a speedy investment. It was not until trial that Plaintiffs learned that Project Cali was never a real project. Altenberg misrepresented

86

[Open Energy] as a "dedicated" source of financing that was a "lock" even though [Open Energy] never made any such commitment.

*Id.* at 43.

It was not until the plaintiffs' post-trial answering brief that the fraudulent inducement theory became the plaintiffs' lead claim. The statement of facts in the post-trial answering brief again spelled out the basis for their fraudulent inducement theory. *See* Dkt. 285 at 3–7. This time, however, the fraudulent inducement claim also became the lead argument in the legal analysis. *See id.* at 28–41. During post-trial argument, plaintiffs' counsel likewise emphasized the misstatements in the solicitation materials and the fraudulent inducement claim. *See* Dkt. 294 at 27–36.

Throughout post-trial briefing and during post-trial argument, Altenberg maintained that the plaintiffs had not properly asserted a fraudulent inducement claim. In his opening brief, he pointed out that the complaint did not assert such a claim. *See* Dkt. 279 at 40, 49–50. In his answering brief, Altenberg expanded on this argument and sought to refute the plaintiffs' allegations of fraud. Dkt. 287 at 16–22. During post-trial argument, plaintiffs' counsel emphasized the absence of any claim for fraudulent inducement in the amended complaint. *See* Dkt. 294 at 72–74.

Given the posture of the case and the debate over the fraudulent inducement claim, the plaintiffs should have moved under Rule 15(b) to amend the pleadings to conform to the evidence presented at trial. In the pre-trial order, each side "expressly reserve[d] the right to supplement or amend its pleadings to the extent allowed pursuant to Court of Chancery Rule 15." PTO ¶ V. After trial, the defendants moved to amend their answer, and

the court granted that motion. *See* Dkt. 295. The plaintiffs did not move to amend, whether under Rule 15(b) or otherwise.

Court of Chancery Rule 15(b) is designed to address this type of situation. It states:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Ct. Ch. R. 15(b). As a leading treatise explains, the federal counterpart to this rule was part of the drafters' effort to leave behind the earlier system in which "the pleadings completely controlled the subsequent phases of the litigation," under which "[e]vidence offered at trial that was at variance with allegations in the pleadings could not be admitted, or, if admitted, would not be allowed to provide the basis for the final disposition of the action." 6A Wright & Miller, *supra*, § 1491. By adopting Rule 15(b) they sought "to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel or on the basis of a statement of the claim or defense that was made at a preliminary point in the action . . . ." *Id.* (footnote omitted).

If the plaintiffs had moved to amend under Rule 15(b), then it would have presented a close question as to whether leave should be granted. When a party has objected to the introduction of evidence on the ground that the material offered is not within the issues framed by the pleadings, the court must balance the general policy that leave to amend should be freely granted against the concern that admitting the evidence will prejudice the party's action or defense on the merits. *See* 6A Wright & Miller, *supra*, § 1495. Delaware

88

decisions likewise state that the primary consideration is whether the opposing party was prejudiced. *Those Certain Underwriters at Lloyd's v. Nat'l Installment Ins. Servs., Inc.*, 2008 WL 2133417, at \*10 (Del. Ch. May 21, 2008), *aff'd,* 962 A.2d 916, 2008 WL 4918222 (Del. Nov. 18, 2008) (ORDER). "Prejudice under the rule means undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party." *Deakyne v. Comm'rs of Lewes*, 416 F.2d 290, 300 (3d Cir. 1969).

Altenberg's counsel claimed during post-trial argument that he was prejudiced because he was not able to engage in motion practice to challenge a fraudulent inducement claim and did not have the opportunity to take discovery into that claim. Dkt. 294 at 73. The former is literally true, but the latter is not. The parties conducted extensive discovery into the pre-contracting period. It also is difficult to ignore the fact that the principal evidence on which the plaintiffs rely came from Altenberg himself through his testimony at trial. Most damaging were Altenberg's statements about Project Cali never having been a project in which the Fund or the plaintiffs could invest, but he also gave damaging testimony about the three-to-six month timeline and about Open Energy. It is not clear what discovery Altenberg could have conducted or what evidence he could have introduced that would have altered the record to his benefit on either Project Cali or the three-to-six-month timeline. He perhaps could have called a witness from Open Energy. Because the most damaging testimony came from Altenberg himself or from his documents, it does not seem equitable to posit counterfactually that Altenberg might have defeated the claim (or aspects of it) at the pleading stage before the plaintiffs were able to develop the necessary evidence.

89

The plaintiffs, however, did not make a motion under Rule 15(b). It thus remains the case that a claim for fraudulent inducement has never properly been introduced into the case. It also remains the case that if the plaintiffs had moved to introduce the claim under Rule 15(b), then Altenberg would have had the opportunity to advance arguments against the amendment, doubtless including arguments that this decision has not anticipated. Accordingly, on the procedural ground that the claim was never validly introduced into the case, judgment will be entered in favor of Altenberg on the fraudulent inducement claim.

## B. Fraud In The Operation Of The Fund

For most of the litigation, the plaintiffs claimed that Altenberg committed fraud while operating the Fund. As discussed in the previous section, the plaintiffs pivoted during their post-trial briefing to a claim for fraud in the inducement. The reduced emphasis that they placed on their claim of fraud during the operation of the Fund was insufficient to prove their claim.

The plaintiffs primarily attempted to establish fraud during the operation of the Fund by linking each of their capital contributions to misrepresentations by Altenberg. Except for the first contribution, which Altenberg induced by making pre-contracting misrepresentations about Project Cali, the plaintiffs contributed capital under the Capital Call Provision after Altenberg issued capital call notices. In twin decisions issued in 2014, this court and the Delaware Superior Court held that the disclosures that fiduciaries make when exercising a contractual right to call for capital are not properly analyzed under the rubric of common law fraud. They are instead properly analyzed as disclosure claims under *Malone v. Brincat*, 722 A.2d 5 (Del. 1998). *See Albert v. Alex. Brown Mgmt. Servs., Inc.*,

90

2004 WL 2050527 at, *3–4 (Del. Super. Sept. 15, 2004); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 157–63 (Del. Ch. 2004). To the extent that the plaintiffs seek to prove a claim for common law fraud based on the capital calls, judgment will be entered in favor of Altenberg.

Regardless of whether the claims are evaluated using the rubric of common law fraud or through the lens of *Malone*, the plaintiffs must prove that the Altenberg acted with *scienter* by making intentionally false statements or by intentionally withholding material information. The plaintiffs did not carry their burden.

In their post-trial opening brief, the sum total of the plaintiffs analysis of the six capital calls appeared in a chart that spanned less than a page. For each capital call, the plaintiffs offered a handful of words about "Altenberg's purported purpose," then a handful of words about what they claimed was "Altenberg's actual, unauthorized and undisclosed purpose." Dkt. 278 at 41–42. In their post-trial answering brief, the plaintiffs converted their chart into a single paragraph of discussion. *See* Dkt 285 at 32–33. This abbreviated treatment was not sufficient to carry their burden to establish *scienter*. Judgment will be entered in favor of Altenberg on this claim as well.

In their post-trial opening brief, the plaintiffs did not point to any instances of fraud during the operation of the Fund other than the capital calls. In their post-trial answering brief, the plaintiffs identified eight other purported instances of fraud. Seven were representations that Altenberg made before the parties entered into the Operating Agreement, not after entering into the Operating Agreement. *See* Dkt 285 at 29–32.

91

The only remaining misrepresentation was Altenberg's promise that all of the Fund's assets would be held in project companies owned by the Fund. *See id.* at 32. As the source of Altenberg's false representation, the plaintiffs cited the Project Company Requirement. Before the parties executed the Operating Agreement, Altenberg represented that each project would be held through a separate project company owned by the Fund, so his representations on that score could have provided yet another basis for a fraudulent inducement claim. During the operation of the Fund, however, the plaintiffs failed to identify any false representation that Altenberg made about whether he was placing the projects in project companies owned by the Fund. He simply ignored the Project Company Requirement.

In January 2017, when Altenberg's counsel mentioned to Jefferson's counsel that the projects were not held in project companies owned by the Fund, Jefferson called out Altenberg about his failure, and Altenberg immediately admitted it. The plaintiffs thus failed to prove the existence of a false representation that could support a claim of fraud on this score, as opposed to a claim for breach of the Operating Agreement. *See Restatement (Third) of Torts: Liability for Economic Harm* § 9, Reporters Note (Am. L. Inst. 2019 & Supp. 2020).

The plaintiffs failed to prove that Altenberg committed fraud during the operation of the Fund. Judgment will be entered in Altenberg's favor on this claim.

## C.     Breach Of Fiduciary Duty

As a separate and independent basis for recovery, the plaintiffs sought to prove that Altenberg breached his fiduciary duties. *See* Dkt. 278 at 49–52. The plaintiffs proved that

92

Altenberg breached the duty of loyalty that he owed to the Fund and its members in his capacity as the human controller of the manager of the Fund. Altenberg breached his duty of loyalty by engaging in self-interested transactions that he did not prove were entirely fair.

### 1. The Existence Of A Fiduciary Duty

A claim for breach of fiduciary duty is an equitable tort.[11] It has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty.[12] The first question therefore is whether Altenberg owed the plaintiffs a fiduciary duty.

The parties agree that the Operating Agreement did not eliminate or modify default fiduciary duties. Dkt. 278 at 44; Dkt. 279 at 53. As Altenberg recognizes, he owed a duty of loyalty to the Fund and the Investment Members as the human controller of Finance. Dkt. 279 at 52–53; *see In re USA Cafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991). The plaintiffs argued that Altenberg owed full fiduciary duties in that capacity, including a duty of care, but that position is contrary to Delaware law. Altenberg owed only a duty of loyalty, not a duty of care. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 670–72 (Del. Ch. 2012).

---

[11] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see also Restatement (Second) of Torts* § 874 cmt. b (Am. Law Inst. 1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct . . . ."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[12] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010); *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

## 2. The Claimed Breaches Of Duty

The plaintiffs sought to prove that Altenberg breached his fiduciary duties in multiple ways. They asserted that he

- "failed to act with care to obtain financing from [Open Energy],"

- "failed to conduct due diligence on the obsolete solar panels,"

- "entered [into] transactions that [the Fund] could not complete,"

- "drew excessive fees" from the Fund,

- "engaged in unauthorized projects and deals,"

- "placed Fund assets into Finance's name" and paid "project-related fees from the Fund" for "projects [that] were not Fund assets,"

- "deprive[d] Plaintiffs of their interest in" the Dans Mountain project, which Altenberg is developing through Energy Nexus, and

- used money from the Fund to pay for various legal fees and expenses.

Dkt. 278 at 45–50.

The plaintiffs explicitly framed the first three of these claims as breaches of the duty of care. *Id.* at 48–49. Only Finance is subject to a claim for the breach of the duty of care. Altenberg is not. *See Feeley*, 62 A.3d at 671. The plaintiffs therefore cannot prevail against Altenberg on those claims.

During post-trial argument, the plaintiffs contended that Altenberg acted for an improper purpose and to obtain self-interested benefits when he "entered into transactions that [the Fund] could not complete" because he was trying to increase the amount of fees that Finance could charge. Dkt. 294 at 109. As described in greater detail below, Altenberg charged the Fund a fee of $10,000 per megawatt for any project that Finance was

94

developing on behalf of the Fund, regardless of what stage it was in, and without regard to whether the project had reached any key milestones. Because of this structure, Altenberg had an incentive to take on more and more projects, even if he never completed any, because he could charge the Fund more fees.

Although the evidence supports it, the plaintiffs did not introduce this theory until post-trial argument. The plaintiffs only argued in their briefs that by pursuing projects that the Fund could not complete, Altenberg breached duty of care. Because that was the only theory that the plaintiffs briefed, that is the only theory that this decision addresses.[13]

Under *USACafes* and *Feeley*, the plaintiffs cannot pursue these claims against Altenberg. As a consequence, during the remedial phase, Altenberg will not face the prospect of any remedy based on (i) fees paid to Open Energy to have it evaluate whether to finance projects, (ii) the acquisition or sale of the GCL Panels, or (iii) amounts that the Fund paid to third parties unaffiliated with Altenberg in connection with any of the projects.

### 3. The Question Of Breach

The foregoing analysis leaves five claims in which the plaintiffs contend that Altenberg breached his duty of loyalty or its subsidiary element of good faith. When reviewing decisions of corporate directors and fiduciaries who owe comparable duties,

---

[13] *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003); *see also In re Mobilactive Media, LLC*, 2013 WL 297950, at *12 n.152 (Del. Ch. Jan. 25, 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (alteration in original) (internal quotation marks omitted)).

95

Delaware law applies one of three standards of review: the business judgment rule, enhanced scrutiny, or entire fairness. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). When a fiduciary who controls an entity approves a transaction, makes a decision, or engages in conduct that benefits the fiduciary, and when no independent decision maker has been involved, then the standard of review is entire fairness, with the fiduciary having the burden of proof. *Ams. Mining*, 51 A.3d at 1239.

"The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Although the two aspects may be examined separately, "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.*

Fairness does not depend on the fiduciary's subjective beliefs. Once entire fairness applies, the fiduciary must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (emphasis in original) (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish

entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

### a. Paying Excessive Management Fees To Finance

The plaintiffs contended that Altenberg breached his duty of loyalty by causing the Fund to pay excessive management fees to Finance. It is undisputed that Altenberg controlled both Finance and the Fund. Delaware law applies the entire fairness standard of review to compensation arrangements, consulting agreements, services agreements, and similar arrangements between a controlled entity and its controller or an affiliate.[14]

Altenberg admits that he caused the Fund to pay approximately $2.37 million in fees to Finance. PTO at 8; *see* JX 1498. This was an interested transaction, and Altenberg therefore bore the burden to prove that causing the Fund to pay this amount was entirely fair.

---

[14] *See Tornetta v. Musk*, 2019 WL 4566943, at *4, *10 (Del. Ch. Sept. 20, 2019) (applying entire fairness to compensation awarded to CEO who was also the company's controlling stockholder); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183–85 (Del. Ch. 2014) (applying the entire fairness standard to (i) payments made under a license agreement between a company and its controlling stockholder and (ii) the company's decision not to defer paying interest on junior notes owned by the controlling stockholder); *Dweck v. Nasser*, 2012 WL 161590, at *23 (Del. Ch. Jan. 18, 2012) (applying the entire fairness standard to (i) consulting fees that a corporation paid to its controlling stockholder and (ii) a joint venture that the corporation entered into with an entity affiliated with the controlling stockholder); *Carlson v. Hallinan*, 925 A.2d 506, 529 (Del. Ch. 2006) (applying the entire fairness standard to (i) compensation paid to a corporation's controlling stockholder, who also was a director; (ii) management fees paid to affiliates of the controlling stockholder; and (iii) the failure to allocate expenses properly to affiliates of the controlling stockholder, who received services from the corporation).

There is ample evidence that causing the Fund to pay $2.37 million in fees to Finance was *not* entirely fair. For starters, Altenberg and Finance never completed a project, and the plaintiffs lost all of the $6.8 million that they invested. Yet Altenberg extracted 35% of the Investment Members' capital through fees paid to Finance ($2.37 million / $6.8 million). Beyond these exorbitant fees, Finance also would have been entitled to 50% of the upside from any successful deals. This eye-popping level of compensation goes far beyond the well-known (and itself lucrative) 2-and-20 fee structure for fund managers.[15] As Jefferson testified at trial, this level of compensation "would make [Altenberg] the highest-paid investment manager in the history of money." Jefferson Tr. 47.

Altenberg charged a management fee of $10,000 per megawatt per month, regardless of the state or stage of the project. The record establishes that industry practice is to pay fees based on the achievement of project milestones. As a general rule, approximately 10% is paid when a project is acquired, then 40% when it reaches NTP, and then 50% when it reaches COD. *See* Altenberg Tr. 362–63. Staging the fees in this fashion ensures that fees are earned based on results and gives the developer an incentive to move the project forward. *See* Altenberg Tr. 366. Altenberg himself refused to pay fees to third parties when he was dissatisfied with their progress, and he parted ways with Blue Sky and

---

[15] *See generally* William Gray Cochran, Note, *Searching for Diamond in the Two-and-Twenty Rough: The Taxation of Carried Interests*, 66 Stan. L. Rev. 953, 957–60 (2014) (describing the structure of private equity partnerships and two-and-twenty fee arrangements).

ended up in legal disputes with DynaSolar and Sunrise Energy over what he maintained was their failure to move projects forward. Yet Altenberg charged the Fund a flat management fee of $10,000 per megawatt per month without regard to project milestones.

Altenberg also charged his flat management fee regardless of how many third-party consultants and advisors he hired to assist him with the projects. When Jefferson and Murphy invested in the Fund, they understood that Altenberg and Finance would be able to handle most of the development work. *See* Jefferson Tr. 69–70, 222; *see also* JX 877. Instead, Altenberg hired DynaSolar, BrightPower, and numerous other third parties to assist him with the projects and charged their fees to the Fund as project expenses. Despite outsourcing much of the project management work, Altenberg nevertheless charged the maximum possible amount permitted by the Operating Agreement as a management fee for Finance.

In addition, the timing of the bulk of the fees is suspect. During 2016, Altenberg withdrew $835,500 in fees from the Fund. *See* JX 1498 at 30–31, 43. During 2017, after his relationship with the plaintiffs fractured, Altenberg withdrew $1,214,790.42 from the Fund. *Id.* All but $109,664.60 of this amount was withdrawn after the plaintiffs filed this litigation. *Id.* During 2018, Altenberg withdrew another $350,000 from the Fund. *Id.* at 30–31.

To defend his actions, Altenberg points to Section 2.9 of the Operating Agreement, which provided that Finance "may receive compensation for services rendered to or on behalf of any Project, and that such compensation shall be treated in each case as . . . a capitalized expense of the Project prior to the Project's Commercial Online Date ('***COD***');

provided, however, such capitalized fees shall not exceed $170,000 per MW for such Project prior to COD . . . ." Op. Agr. § 2.9 (emphasis in original).

The fact that the Operating Agreement authorized Finance to receive a management fee of up to $170,000 per megawatt does not insulate Altenberg's self-interested conduct from fiduciary review. The provision in the Operating Agreement confirmed that Finance had the *power* to receive compensation from the Fund, thereby addressing the first step in Adolf Berle's famous "twice-tested" framework. It did not address the second step, which asks whether the fiduciary properly exercised his power. *See In re Inv'rs Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1222–23 (Del. 2017). Altenberg's situation was analogous to a board of directors that has been authorized to grant itself compensation under a stockholder-approved plan that allows "directors [to] retain discretion to make awards under [] general parameters . . . ." *Id.* at 1222. In that setting, the directors still must prove that "their self-interested actions were entirely fair to the company." *Id.* at 1223; *see Sample v. Morgan*, 914 A.2d 647, 663–64 (Del. Ch. 2007).

To justify the fees on the merits, Altenberg does what he elsewhere strenuously objects to doing: he looks through Finance's existence as a separate entity to introduce evidence about how Finance used the fees that it received from the Fund. He testified generally that the $2.37 million "went to the operations of VERT Solar Finance," including "[t]hird parties, legal, consultants, and salaries." Altenberg Tr. 489–90. He argued that of this amount, Finance paid $643,500 to third parties for business expenses. Dkt. 279 at 30–31 (citing JX 1498). He argued that all of the remaining $1.65 million was used to pay

for employees and contractors, with $400,000 going to himself and his wife. *See id.* at 30–31, 54 (citing JX 1498). Altenberg provided a compilation of the inflows and outflows to and from the Fund and Finance, but it grouped spending into large categories, did not break out categories such as payments through Bill.com, and did not explain what particular expenses were for. *See* JX 1498.

Doctrinally, the fairness of the fees that the Fund paid to Finance does not turn on how Finance used the money. It turns on whether the level of fees that Finance drew was fair to the Fund. If Finance drew a fair fee, then Finance could use the money however it wanted.[16]

As a practical matter, Altenberg's approach of looking through Finance to justify the fairness of the fees that he drew assumes that it would be fair for the Fund to bear 100% of Finance's operating expenses. Altenberg in fact charged the Fund for Finance's operating expenses, such as for sales courses and for a computer programmer who converted some of Finance's software from a spreadsheet to a web-based application. *See* Altenberg Tr. 564–65, 718–19; *see also* Altenberg Tr. 667–68 (conceiving of the Fund as analogous to a working capital facility).

---

[16] The plaintiffs attempt a variant of the look-through argument by objecting that Altenberg unilaterally decided how much to pay himself and also put his wife on the payroll for Finance at a salary of $75,000 per year. The plaintiffs point out that Altenberg's wife was a part-time office manager, and yet she was paid more than any other employee. *See* Altenberg Tr. 668–671. As long as Finance's fees were fair to the Fund, it does not matter how Altenberg allocated those fees within Finance. Minority investors in Finance might have standing to complain about the payments that Altenberg and his wife received, but the Investment Members and the Fund do not.

The plaintiffs did not agree to fund all of Finance's business expenses. They refused to invest directly in Finance and insisted on investing in a separate entity—the Fund—precisely so that they would not be providing a source of effectively unrestricted capital to fund Altenberg's business. The plaintiffs only agreed to invest in projects, not Finance's business.

The agreement that Altenberg reached with the plaintiffs also benefited him. Through Finance, Altenberg could develop streams of income independent of the Fund that he would not have had to share with the Fund. He likewise could secure investments in Finance that he would not have to share with the Fund. Altenberg succeeded in securing an investment of $30,000 in Finance from a startup incubator called the Surge Accelerator in return for 7% of the equity in Finance. *See* JX 387 at '398. The record shows that Altenberg tried to develop alternative streams of income. He also tried to secure other sources of investment.

Altenberg failed to carry his burden of proving that it was entirely fair for Finance to extract $2.37 million in fees from the Fund. He failed to introduce any evidence of fair dealing. He admitted that he determined the amount of the fee unilaterally. Altenberg Tr. 394. He also admitted that he used his discretion to set the fee at the maximum fee that the Operating Agreement would allow. Altenberg Tr. 396.

Altenberg failed to prove that the fees he charged the Fund reflected a fair price. The parties established the fee cap based on two assumptions: (i) Finance's fees should not exceed $10,000 per month per megawatt and (ii) a solar project should be operational within seventeen months. *See* JX 159 at '394; Altenberg Tr. 361–64, 368. Altenberg

represented to Jefferson and Murphy that he would bring the Fund's projects to fruition within three to six months, and Altenberg agreed with the Investment Members that he would complete an initial project before embarking on more projects. Once the initial project had reached commercial operations, it could be refinanced, and the Investment Members would receive a return of their capital, plus a return from the cash flows that the project generated. The Investment Members clearly expected Altenberg to get paid for completing projects and generating returns, not just for working on projects.

Instead of following the anticipated business model, Altenberg bought large portfolios of projects and attempted to develop multiple projects at once. Altenberg's approach increased the amount of fees that Finance drew from the Fund, because Finance was working on many megawatts of projects, but Altenberg's approach was fundamentally unfair to the Fund. Under his portfolio-based approach, if he started work on multiple projects that theoretically might generate 100 megawatts if they ever were completed, then he could charge $1 million in management fees to the Fund every month, even if none of the projects ever achieved NTP. On a smaller scale, this is what happened. Altenberg charged the Fund for lots of preparatory work on lots of projects without ever making real progress toward completing a project for the Fund.

Altenberg failed to prove that it was entirely fair to charge the Fund on a per-megawatt basis, without regard to project milestones, when he was pursuing several projects simultaneously. The approach that he took drained the Fund of its capital and enriched Finance without providing any returns to the Fund or to the Investment Members. Once he embarked on his portfolio-based strategy, Altenberg should have identified a fair

way to charge expenses to the Fund. The best course of action would have been to agree on a methodology with the Investment Members. Absent that, Altenberg should have developed a fair fee structure. He could have charged fees based on the milestones used in the contracts that he entered into with Blue Sky, Sunrise Energy, and other providers. Altenberg instead opted to charge the maximum possible fees.

Altenberg failed to carry his burden of proof and is liable to the Fund for the fees that he charged. During the remedial phase, the likely remedy for this breach of fiduciary duty will be to hold Altenberg personally liable for $2.37 million. In connection with the remedial phase, the parties will specify the exact amount and identify the dates of payment to facilitate an award of pre- and post-judgment interest.

### b. Holding The Fund's Assets In Finance's Name

The plaintiffs contended that Altenberg breached his duty of loyalty by "plac[ing] Fund assets into Finance's name." Dkt. 278 at 45. The plaintiffs proved that Altenberg engaged in self-dealing by holding the Fund's assets in Finance's name. Altenberg did not demonstrate that these actions were entirely fair.

The Project Company Requirement contemplated that each project would be held in a special purpose vehicle, which would be a wholly owned subsidiary of the Fund, from the time of acquisition. PTO ¶ 25; Op. Agr. §1.2. The purpose of holding the projects in special purpose vehicles owned by the Fund was to ensure that the Fund received value in return for its investments.

Altenberg breached the Project Company Requirement, and he did so in a self-interested manner that implicated his fiduciary duties. Altenberg did not place the Fund's

104

projects into special purpose vehicles owned by the Fund. He created a project company for the Blue Sky Portfolio, but he never completed the transfer. It was not until after Jefferson called out Altenberg for not placing the projects in project companies that Altenberg and his lawyer completed the assignment, effective March 31, 2017. *See* JX 1040. Altenberg also caused Finance to acquire the Beltline Portfolio. *See* JX 480. Finance owned those projects, not the Fund.

By using the Fund's money but keeping title in Finance's name, Altenberg conferred benefits on Finance at the expense of the Fund. Because it held legal title to the assets, Finance could portray the assets as its own and deploy them as it wished. Finance also would be protected if any creditor sued Finance because Finance held the assets. In this way, Altenberg could satisfy liabilities, including money judgments, incurred by Finance using the assets that it held in its own name, even though those assets technically belonged to the Fund. By holding the projects in Finance's name rather than the Fund's, Altenberg engaged in self-dealing.

Altenberg's actions had serious consequences for the Fund. DynaSolar asserted claims against Finance to recover the guaranteed minimum payment it was due under the Master Consulting Services Agreement and the amounts it was due for the DynaSolar Acquisition. As part of the settlement between Finance and DynaSolar, Altenberg agreed that DynaSolar could keep $1.25 million from the sale of the Beltline Portfolio to Boviet, which remained in an escrow account subject to DynaSolar's liens. As a result, the Fund lost $1.25 million on the Beltline Portfolio. Altenberg Tr. 641. If Altenberg had caused the

Fund to purchase the Beltline Portfolio, then the Fund would have entered into the sale agreement with Boviet, and the Fund would have received the proceeds.

Altenberg argues that the Investment Members' implicitly agreed that he could hold Fund assets in Finance's name because he sent them the asset purchase agreements, which indicated that Finance had purchased the assets. The minimal act of sending an asset purchase agreement, together with the failure to object, is not sufficient to constitute ratification. Among other reasons, the fact that Finance was the nominal purchaser did not prevent Finance from assigning the projects to project companies owned by the Fund, as contemplated by the Project Company Requirement. The record clearly establishes that the plaintiffs never approved having Finance hold the rights to the projects; they first became aware that Altenberg was engaging in this practice in January 2017.

Altenberg also relies on a side letter that Jefferson signed and produced in discovery, but which was never fully executed. *See* Dkt. 279 at 50. In January 2015, Jefferson learned that Altenberg had not placed any projects in special purpose entities owned by the Fund. *See* JX 855. To attempt to remedy the ownership problem, Jefferson's lawyers had Altenberg's lawyer prepare a side letter which provided that all "third party agreements shall be deemed to be entered into by [Finance] for the sole benefit of the [Fund] and its Members." JX 874 at '947. Jefferson signed it and sent it to his counsel, but ultimately did not return the document to Altenberg because it also contained provisions favorable to Altenberg. *See* Jefferson Tr. 279. Altenberg never signed it. JX 873. The side letter thus does not reflect an agreement between the parties. Moreover, the point of the side letter was to recognize that Finance already had kept the Fund's assets in its name and to

106

document that Finance was holding those assets for the benefit of the Fund. The side letter is evidence of the underlying problem, not evidence that there was no underlying problem.

Altenberg did not otherwise attempt to prove that his decision to hold Fund assets in Finance's name was entirely fair to the Fund. Relying on his own testimony, Altenberg made a bare assertion that he did not breach the duty of loyalty because "even though a Fund asset may have been held in the name of Finance, it was treated as an asset of the Fund." Dkt. 287 at 35 (citing Altenberg Tr. 701). Altenberg did not back up his self-serving testimony with actual evidence that he considered and treated the projects as assets of the Fund. Nor did Altenberg's self-serving testimony have any effect on whether Finance's creditors would treat the projects as assets of the Fund.

By treating the Fund in this manner, Altenberg forced the Fund to accept terms that no third party would provide. Any third-party source of equity financing would have insisted on some ownership interest in return for its funds. Altenberg Tr. 378. Any third-party source of debt financing would have received a loan agreement, a note, and likely a security interest in return for its funds. *See id.* The Fund did not get anything. *Id.* at 379.

Altenberg failed to establish that holding the Fund's assets in Finance's name was entirely fair to the Fund and the Investment Members. He therefore breached his duty of loyalty by failing to hold title to the Fund's assets in the Fund's name. During the remedial phase, the likely remedy for this breach of fiduciary duty will be to hold Altenberg personally liable for the $1.25 million that the Fund lost on the Beltline Portfolio because Altenberg agreed to pay that amount to DynaSolar to settle DynaSolar's claims against Finance.

107

### c. Causing The Fund To Pay For Project-Related Fees

The plaintiffs also contended that Altenberg breached his duty of loyalty by causing the Fund to pay project-related fees for projects that were held in Finance's name. Dkt. 278 at 46. This argument is the flipside of the plaintiffs' contention that Altenberg breached his duty of loyalty by not transferring the projects to the Fund. In this version of the argument, the plaintiffs accept that Altenberg did not transfer the projects to the Fund and argue that he therefore should not have spent money from the Fund on projects that did not belong to the Fund.

This decision has found that Altenberg breached his duty of loyalty by not transferring the projects to subsidiaries of the Fund. The Fund should have been the owner of the projects. Because the Fund was the equitable owner of the projects, it was not a fiduciary wrong for Altenberg to spend money from the Fund developing the projects. During the remedial phase, the plaintiffs will not be entitled to any remedy for amounts that Altenberg caused the Fund to pay to third parties unaffiliated with Altenberg in connection with any of its projects.

More narrowly, the plaintiffs argue that after selling the Beltline Portfolio, Altenberg "did not return the sale proceeds to the Fund or the investors" and "assert[ed] Plaintiffs are not entitled to the proceeds of the sale." Dkt. 278 at 46. This appears to refer to the development fee that Altenberg received from Boviet.

The development fee was part of the consideration for the sale of the Beltline Portfolio, which was an asset of the Fund. By unilaterally taking all of the development fee, Altenberg diverted consideration from the Fund and engaged in self-dealing. Altenberg

108

did not make any effort to establish that it was entirely fair for Finance to keep the development fee. He did not point to any evidence of fair dealing, and he did not address the fairness of the price.

Keeping the development fee also ran contrary to his earlier representations to the plaintiffs. Altenberg represented to Jefferson and Murphy that a portion of the fee would be returned to the Fund. *See* JX 816. Altenberg later proposed that the Fund receive half of the development fee for the first 25 megawatts of projects. After the relationship between Altenberg and the plaintiffs broke down, Altenberg instructed his accountants not to credit any of the fee to the Fund. *See* JX 1002. Finance kept the full development fee, which Altenberg estimated to be $400,000. Altenberg Tr. 721.

Altenberg breached his fiduciary duty of loyalty to the Fund by taking the entire development fee. During the remedial phase, the likely remedy for this breach will be that Altenberg will be held personally liable for the actual amount of the development fee. Altenberg testified that this amount was around $400,000, but he was not a credible witness, and there is evidence in the record suggesting that the amount was higher. *See, e.g.*, JX 278 at '337; JX 484; JX 743; JX 952 at '055–56. In connection with the remedial phase, the parties shall quantify all amounts that Altenberg (through Finance or otherwise) received from Boviet and the dates of payment to facilitate an award of pre- and post-judgment interest.

### d.     Causing The Fund To Pay Legal Fees And Expenses

In multiple arguments interspersed throughout their briefs, the plaintiffs complain that Altenberg caused the Fund to pay for various legal expenses. They object that

109

Altenberg's actions "resulted in expensive arbitrations" with DynaSolar, Beltline, and Sunrise, that the Fund "paid the legal fees for these arbitrations," and that "[w]hen the settlement payments were issued, Altenberg transferred the payment from the Fund to Finance." Dkt. 278 at 47. They also assert that Altenberg used Fund money to pay his legal fees in this action. *Id.* Elsewhere, the plaintiffs argue that Altenberg breached his fiduciary duties by charging the Fund for legal expenses for lawyers who represented Finance. *Id.* at 46.

Unless the Fund was contractually obligated to pay for Finance's legal fees, then causing the Fund to pay for Finance's legal fees was an interested transaction, and Altenberg would be obligated to prove that having the Fund pay Finance's legal fees was entirely fair. *See Havens*, 1997 WL 55957, at *13. Section 5.3 of the Operating Agreement contains the following indemnification provision:

> To the fullest extent permitted by law, the [Fund] . . . shall indemnify and hold harmless each Indemnified Party who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the [Fund]), by reason of any act or omission or alleged act or omission arising out of such Person's activities as a Manager, executive officer or Member if such activities were performed in good faith either on behalf of the [Fund] or in furtherance of the interests of the [Fund], and in a manner reasonably believed by such Person to be within the scope of the authority conferred by this Agreement or by law or by the consent of the Members in accordance with the provisions of this Agreement, against losses, damages, or expenses, on as as-incurred basis, for which such Person has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amount paid in settlement) actually and reasonably incurred by such Person in connection with such action, suit or proceeding so long as such Person was not guilty of gross negligence, willful misconduct or any other breach of duty with respect to such acts or omissions, and, with respect to any criminal action or proceeding, and had no reasonable cause to believe its conduct was unlawful and provided that the satisfaction of any

110

> indemnification and any holding harmless shall be from and limited to [Fund] assets and the Members shall not have any personal liability on account thereof.

Op. Agr. § 5.3 (the "Indemnification Provision").

The parties have not made any effort to parse through the arbitrations and litigations in which Altenberg and Finance were involved or to grapple with the scope of the Indemnification Provision for purposes of those disputes. There are many issues that would have to be addressed, starting with whether Altenberg acted in a covered capacity for purposes of those proceedings. The arbitrations and litigations with DynaSolar and Sunrise Energy have concluded, so the analysis also would have to address whether Altenberg was successful on the merits or otherwise as a result of the settlements. It is possible that the plaintiffs could show that Altenberg was not entitled to indemnification for some of the proceedings, and it seems likely that if they had done so, then Altenberg would have been unable to prove that it was entirely fair to cause the Fund to pay the legal expenses for those proceedings, but the plaintiffs did not make the necessary threshold showing.

The parties also have not delved into the amounts that Altenberg spent on legal fees outside of the arbitrations and litigations. The Indemnification Provision would not apply to those fees. The question instead would be whether they could be treated legitimately as project costs that advanced the interests of the Fund. It is possible that the plaintiffs could show that some of the fees benefitted Altenberg and Finance and should not have been charged to the Fund. It seems likely that if the plaintiffs had proven that, then Altenberg would have been unable to prove that it was entirely fair to cause the Fund to pay those fees. The plaintiffs again failed to make the necessary predicate showing.

111

The plaintiffs also seek to recover amounts that Altenberg advanced to himself to defend this litigation. Under the Operating Agreement, Altenberg was not entitled to mandatory advancements, only to indemnification. Dkt. 90 at 26. He nevertheless decided to advance himself expenses. That decision is a self-interested transaction that is subject to entire fairness review. *See Havens*, 1997 WL 55957, at *13.

Altenberg appears to have advanced himself a total of $179,500.21. *See* PTO ¶¶ 108–113, 115; JX 1083; JX 1101; JX 1120. Altenberg did not make any effort to prove that the advancements that he paid to himself were entirely fair to the Fund and to the Investment Members. Altenberg breached his fiduciary duties by causing the Fund to advance these amounts to him. During the remedial phase, the likely remedy will be to hold Altenberg personally liable for $179,500.21. In connection with the remedial phase, the parties shall confirm the amounts and identify the dates of payment to facilitate an award of pre- and post-judgment interest.

### e. Transferring The Dans Mountain Project To Energy Nexus

Lastly, the plaintiffs contended that Altenberg breached his fiduciary duties by "depriv[ing] Plaintiffs of their interest in [Energy Nexus]'s projects." Dkt. 278 at 50. The plaintiffs point specifically to Altenberg's acquisition of the Dans Mountain project using VSF Devco, a project company that was a subsidiary of the Fund. *Id.* at 37.

In April 2018, Altenberg and Finance entered into a letter of intent to acquire the Dans Mountain project for $70,000 per megawatt. *See* JX 1263. In November 2018, VSF Devco purchased the Dans Mountain project. JX 1340. Altenberg formed VSF Devco in August 2016 as a wholly owned subsidiary of the Fund. JX 624; *see* JX 1476. In September

2018, Altenberg formed Energy Nexus as a wholly owned subsidiary of VERT Investment Group, his personal holding company. Altenberg subsequently tried to develop the Dans Mountain project through Energy Nexus. *See* JX 1400; JX 1404.

Altenberg claims that he did not use any moneys from the Fund to acquire the Dans Mountain project or to start Energy Nexus, but the plaintiffs have introduced evidence that Altenberg used Fund assets during the relevant time period. Between April 30 and November 31, 2018, Altenberg transferred $350,000 from the Fund to Finance. *See* JX 1498 at 30–31. Altenberg also transferred another $39,700 from the Fund to VERT Investment Group. *Id.* at 58. And he tapped the Fund during this period by using Bill.com and by using his ATM card. *See id.* at 57, 61. There were some offsetting transfers to the Fund during this period, but the evidence clearly points to Altenberg's use of Fund assets to some degree.

Otherwise, the plaintiffs complain that Energy Nexus is essentially a re-boot of Finance. It certainly looks like it. But as long as Altenberg did not use Fund assets, then there is nothing wrong with that. Although he failed with Finance and the Fund, Altenberg can try again with Energy Nexus. The plaintiffs do not have any right to the life-lessons and experience that Altenberg acquired.

During the remedial phase, Altenberg will account for the Fund assets that he used during the period when he was acquiring the Dans Mountain project and starting Energy Nexus. If he cannot demonstrate that he properly used the Fund's assets, then he will be forced to disgorge those amounts, together with pre- and post-judgment interest.

113

### 4. The Exculpation Defense

Altenberg argues that even if he breached his fiduciary duties, he cannot be held liable under Section 5.3 of the Operating Agreement. Dkt. 279 at 55–57. This provision eliminates monetary damages as a remedy for certain breaches of duty by certain parties. It states:

> No Manager, executive officer or Member (each an "***Indemnified Party***") shall be liable, responsible or accountable in damages or otherwise to the [Fund] or any Member for any loss or damage incurred by reason of any act or omission performed or omitted by such Indemnified Party in good faith either on behalf of the [Fund] or in furtherance of the interests of the [Fund] and in a manner reasonably believed by such Person to be within the scope of the authority granted to such Person by this Agreement or by law or by the consent of the Members in accordance with the provisions of this Agreement, *provided that such Person was not guilty of gross negligence, willful misconduct or any other breach of duty with respect to such act or omission.*

Op. Agr. § 5.3 (second emphasis added) (the "Exculpation Provision").

Altenberg is not entitled to exculpation because the elimination of liability for monetary damages is qualified in all respects by the following proviso: "*provided that such Person was not guilty of gross negligence, willful misconduct or any other breach of duty with respect to such act or omission.*" This decision has held that Altenberg breached his fiduciary duty of loyalty. Exculpation therefore is unavailable.[17]

---

[17] Altenberg also falls outside the scope of the Exculpation Provision, which eliminates monetary liability for a "Manager, executive officer or Member." The Operating Agreement defines "Manager" as "the Management Member or any Person appointed by the Management Member to serve as Manager in accordance with Section 5.1B, in such Person's capacity as Manager of the Company." Op. Agr. at 23 sched. 2. The Exculpation Provision only grants exculpation to the three categories of named parties. Its plain

114

## 5.     The Remedy For Breach Of Fiduciary Duty

This decision does not specify a remedy for Altenberg's breaches of fiduciary duty. The parties focused their efforts at trial, in their post-trial submissions, and during post-trial argument primarily on the question of liability and not the issue of remedy. The financial records of the Fund and Finance were maintained poorly, and although the necessary information to quantify an award for Altenberg's breaches of fiduciary duty could well exist in the form of bank statements and invoices that are scattered throughout the record, the court is not in a position to sift through the information to make or confirm the specific calculations. Altenberg assembled a summary, but it groups income and expenses into broad categories, does not provide supporting explanations, and is a generally confusing document. *See* JX 1498.

The parties will need to provide supplemental submissions on the question of remedy. This decision has indicated what the likely remedies will be and has identified issues that need to be clarified. Counsel should attempt to reach agreement on these points. If an agreement cannot be reached, then some limited discovery may be necessary.

The parties' supplemental submissions also should address how to account for the role of the Fund. The plaintiffs' claim for breach of fiduciary duty appears derivative, so any recovery from Altenberg presumptively goes to the Fund. There is good reason to think that because the Fund is effectively defunct, it should be dissolved, its affairs wound down,

---

language does not extend to their associates or affiliates, or to the parties who control them. *See In re Altas Energy Res. LLC*, 2010 WL 4273122, at *7 (Del. Ch. Oct. 28, 2010).

and its certificate of formation cancelled. To the extent that this course of action is warranted, the court has a strong preference for appointing a neutral receiver to carry out those tasks, but the receiver would need to be compensated.

The parties doubtless will identify other issues that need to be considered. The parties will confer and submit a joint list of issues that will need to be addressed during the remedial phase. The court then will determine whether a conference is warranted to discuss how to proceed.

## D. Breach Of The Operating Agreement

The plaintiffs finally argue that Altenberg breached both the explicit terms of the Operating Agreement and the implicit terms supplied by the implied covenant of good faith and fair dealing. That theory fails because Altenberg was not a party to the Operating Agreement. As a fallback, the plaintiffs maintain that they proved that Finance breached the Operating Agreement and that Finance's entity veil should be pierced. Because of the automatic stay that resulted from Finance declaring bankruptcy, this court cannot adjudicate whether Finance breached the Operating Agreement.

"It is a general principle of contract law that only a party to a contract may be sued for breach of that contract." *Gotham P'rs v. Hallwood Realty P'rs*, 817 A.2d 160, 172 (Del. 2002) (internal quotation marks omitted). Finance was a party to the Operating Agreement, both as the Manager of the Fund and as its Management Member. Altenberg, however, was not a party to the Operating Agreement. *See* Op. Agr. at 1, 20–23. Doctrinally, Finance can be sued for breaching the Operating Agreement, but Altenberg cannot.

The plaintiffs contend that Finance breached the Operating Agreement and that Altenberg can be held personally liable for Finance's breaches "under a veil piercing or agency theory." Dkt. 285 at 53–54. This court cannot adjudicate that issue because it requires a predicate determination that Finance breached the Operating Agreement. Finance declared bankruptcy, and because of the automatic stay, this court cannot address a claim that Finance breached the Operating Agreement. Without a predicate determination that Finance breached the Operating Agreement, grounds do not exist to assess whether its separate existence should be ignored and liability imposed on Altenberg.

Altenberg contends that to the extent that he breached the terms of the Operating Agreement, the plaintiffs waived those claims or are estopped from asserting them. *See* JX 279 at 58–59. Because this decision has not reached the breach of contract claims, it is not necessary to consider those defenses.

## III.  CONCLUSION

The record at trial established that Altenberg induced the plaintiffs to invest in the Fund by making fraudulent misrepresentations, but the plaintiffs are not entitled to receive a remedy on this theory because they did not present it in a procedurally proper way. The plaintiffs failed to prove that Altenberg committed fraud while managing the Fund. The plaintiffs proved that Altenberg engaged in self-interested transactions, and Altenberg failed to prove that those transactions were entirely fair. Altenberg breached his duty of loyalty in connection with those transactions. Further proceedings are necessary to craft a specific remedy. This decision has not reached the plaintiffs' claim that Finance breached its contractual obligations under the Operating Agreement and that Altenberg should be

117

held personally liable for the resulting damages after piercing Finance's entity veil. Finance has declared bankruptcy, and the claim for breach of contract against Finance has been stayed.